# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL NO. 6:06-60074-07 |
| VERSUS | * | JUDGE DOHERTY |
| ANTONIO LUNA VALDEZ, JR.  (07) | * | MAGISTRATE JUDGE HILL |

## <u>REPORT  AND RECOMMENDATION</u>

Before the court is the Motion to Dismiss filed by defendant, Antonio Luna Valdez, Jr. ("Valdez").  [rec. doc. 919].  By the instant Motion, Valdez seeks dismissal of the pending second superseding indictment under this court's supervisory powers, or, alternatively, that Eric Alexander be prohibited from testifying at trial, because of alleged prosecutorial misconduct.  The government filed Opposition, to which Valdez has filed a Reply. [rec. docs. 930 and 937].  The Motion was referred to the undersigned for Report and Recommendation. [rec. doc. 925].  An evidentiary hearing was held on September 27, 2011 through September 29, 2011 and the Motion was taken under advisement.  The parties have filed post-hearing memoranda. [rec. docs. 954 and 956].  Valdez has also filed a proffer regarding his claim of selective prosecution. [rec. doc. 957].

Based on the record, evidence adduced at the hearing and the applicable jurisprudence, it is **RECOMMENDED** that Antonio Luna Valdez Jr.'s Motion to Dismiss [rec. doc. 919] be **DENIED.**

## PROCEDURAL BACKGROUND

On  November 16, 2006, Valdez was named with twelve others in a multi-count

indictment ("original indictment) charging him with conspiracy to possess with intent to

distribute cocaine, cocaine base and marijuana in violation of 21 U.S.C. § 846 (Count 1).

The government also sought forfeiture of certain items pursuant to 21 U.S.C. § 853

(Count 16).  [rec. doc. 1].

The indictment alleges that Valdez knowingly participated in a large-scale drug

conspiracy, in which co-defendant Eric Alexander ("Alexander") was a key member, by

knowingly procuring, smuggling and transporting cocaine and marijuana from Mexico

into the United States through the Rio Grande Valley.  The government alleges that

hidden compartments were built into vehicles and used to hide the illegal drugs. These

hidden compartments were allegedly manufactured and installed by B & M Auto and 4 x

4

("B & M"), a business located at 1909 Jefferson Street in Lafayette, Louisiana, in which

co-defendants Michael Scott Wyatt ("Wyatt") and Barry Neveu ("Neveu"), were partners.

Valdez is not alleged to have had any connection with Wyatt, Neveu or B & M.

Rather, he is named in overt acts dealing solely with his having been in possession of

drugs, having been a visitor at the residence of Alexander (after which suspected drug

related activities occurred), having been a passenger in a vehicle in which another

passenger was found to have been carrying drugs and as having been the titled owner of

2

two trailer trucks found to contain a large sum of money and a large quantity of marijuana.

More specifically, overt act (a) alleges that on February 11, 2003, Valdez possessed marijuana and cocaine in Arkansas.

Overt act (d) alleges that on April 27, 2004, Valdez, Victor Luna Valdez and Sabina Luna Valdez visited the residence of Alexander and Francisca Wiltz Alexander, after which Alexander deposited $5,000.00 into a credit union account (overt act (e)).

Overt act (f) alleges that on May 21, 2004, Valdez, Victor Luna Valdez and Sabina Luna Valdez again visited the residence of Alexander and Francisca Wiltz Alexander and within days thereafter, Alexander entered a storage center, which was later found to contain marijuana (overt acts (g) and (h)).

Overt act (j) alleges that on November 26, 2004, Valdez was a passenger in a vehicle with Victor Luna Valdez and Sabina Luna Valdez, which was entering the United States from Mexico, wherein Sabina Luna Valdez was found to have been carrying six kilograms of cocaine and three grams of cocaine base on her person.

Overt acts (p) and (q) allege that on April 23, 2006 and May 20, 2006, respectively, tractor trucks titled to Valdez, were stopped and found to be carrying $961,155.00 and 335 kilograms of marijuana, respectively.

On November 14, 2007, Valdez was named in a superceding indictment, charging several co-defendants, including Alexander and Neveu, with a second conspiracy to

commit money laundering and, additionally, renumbering the forfeiture count. [rec. doc. 235].

The superceding indictment alleges that Alexander and Neveu knowingly participated in a scheme to conceal the proceeds of drug trafficking activities.  This was accomplished, allegedly, by Neveu receiving drug proceeds from Alexander, depositing the funds into a B & M bank account, and then issuing B & M payroll checks to Alexander, to create the appearance that Alexander was a B & M employee, and to avoid federal financial reporting requirements.  Neveu's former spouse, Jennifer McKnight ("Jennifer"), and her mother, Deborah McKnight ("Deborah"), were former B & M employees who apparently knew of the scheme, but were not indicted.

The overt acts naming Valdez in the superceding indictment are the same as in the original indictment, except that Francisca Wiltz Alexander is not mentioned in overt acts (d) and (f), presumably because she had already entered a guilty plea prior to the return of the superceding indictment. [*See* rec. doc. 232].

The same grand jury heard the evidence on both the original and first superceding indictments.  Moreover, the evidence for both indictments was presented by the same Assistant United States Attorney, Mr. Brett Grayson ("AUSA Grayson").

The case was set for jury trial beginning on January 21, 2009.  Prior to trial, Alexander and all other co-defendants, except Wyatt, Valdez and Yvette Francis Eaglin ("Eaglin"), entered guilty pleas.

Trial of the three remaining defendants, Wyatt, Valdez and Eaglin, began on

January 21, 2009.  Alexander, who after entering a guilty plea, had become a cooperating

government witness, testified on direct examination by AUSA Grayson in pertinent part

as follows:

> Q. Now there was a third person you identified in court awhile ago, Mr.
> Wyatt.
> A. Yes, sir.
> Q. How long have you known him?
> A. I've been knowing Mr. Wyatt since '99.
> Q. And how did you come to meet him?
> A. They had just opened up B & M, and I had like two months to turn or a
> month to turn myself in, and they was just getting started. That's how I met
> him, through Barry Neveu.
> Q. Did you go to where they were doing their business?
> A. Yes, sir.
> Q. Were you a customer?
> A. At that time they was just starting. He was just, you know, telling me --
> THE COURT: Okay. Listen to his question, Mr. Alexander. His question to
> you was: Were you a customer when you went that first time?
> THE WITNESS: Yes, sir.
> Q. (By Mr. Grayson) What were you looking at? What merchandise were
> you looking at?
> A. CD players, speakers, amps, car equipment.
> Q. Did you actually buy something, or did you just come and look?
> A. I just was looking.
> Q. Did you tell them why you weren't buying anything?
> A. Cause I had to turn myself in.
> Q. Did you tell them that?
> A. Yes, sir.
> Q. So you told him that you were -- where you were going?
> A. Yes, sir.
> Q. What did you tell them where you were going?
> A. I told them I had to do prison time in Texas.
> Q. Did anybody ask why you were spending some time in Texas?
> A. They knew what I was doing on the street.
> Q. How did they know that?

5

A. At -- Barry Neveu found a bag of marijuana in my speaker box at Ricky Smith.

Q. Now why was Barry Neveu at Ricky Smith?

A. Because he was an installer over there.

Q. Now, after you got back from prison, that was in what year?

A. 2000.

Q. Did you have occasion to visit their establishment then?

A. Yes, sir.

Q. And were you a customer then?

A. Yes, sir.

Q. And what were you shopping for when you went to visit them?

A. Stereo equipment.

Q. Did you have -- were you back in the business that you'd been in before you went to prison?

A. Yes, sir.

Q. And did you have more money than you had when you just got out of prison?

A. No, sir. I just had went and looked, but to see how they advanced in they business.

Q. So you really weren't in the high market?

A. Not just yet.

Q. Okay. So when you went over there, did you buy, eventually buy some stereo equipment?

A. At first, no. Then he gave me, he gave me a deal. I had bought me a brand new Denali. He gave me a deal I couldn't pass up to advertise B & M.

THE COURT: Who is "he," Mr. --

THE WITNESS: Barry and Michael Watts [sic].

Q. (By Mr. Grayson) Well, who made the negotiation or the deal with you?

A. Barry and Michael Watts.

Q. Both of them together?

A. Both of them.

Q. And what did they install in your vehicle?

A. They install like -- any other place would have charged me, like, probably 10 grand. They had charged me 5 grand.

Q. Now, at that time, were you employed somewhere?

A. I was at Schilling Distributors.

Q. What again?

A. Schilling Distributors.

Q. All right. And how long did you work there?

A. I worked there two years before I went to prison, and I had been there like a year prior to when I went to see them.

6

Q. All right. So while you were running dope before you went to TDC, you were working at Schilling.

A. Yes, sir.

[rec. doc. 540, pgs. 208-211].

On cross examination by Wyatt's attorney, William L. Goode ("Goode"),

Alexander testified as follows:

Q. (By Mr. Goode) You went to jail in Texas on August 26, 1999; is that correct?

A. Yes, sir.

Q. You were arrested on April 24, 1999, on that marijuana charge in Texas.

A. Yes, sir.

Q. And you went to court and pled guilty on July 26, 1999.

A. Yes, sir.

Q. And you testified that you went by B & M before you went to jail --

A. Yes, sir.

Q. -- in 1999.

A. Yes, sir.

Q. Did you go by B & M before you were arrested on April 24, 1999?

A. No. It was before I had to turn myself in. I had been arrested already.

Q. Did you go by B & M before you actually went to court in July and were sentenced, July 26th?

A. No, they wasn't open. They wasn't open.

Q. All right. So they opened between July 26th and the time you went to jail on August 26th?

A. Best of my knowledge.

Q. And when you went by there, were there customers there?

A. No.

Q. What -- were there products there, did they have stereos there?

A. At the time they was just getting started. He had to -- he had to get the money first. Then he had to order.

THE COURT: Okay. Who is "he," Mr. Alexander?

THE WITNESS: Well, Barry and Mike. They didn't have no products really there. A little bit, but not many. They was just getting started.

Q. (By Mr. Goode) Okay. They had some products. They had some stereos?

A. Yeah, but not much.

Q. Had some radios?

**7**

A. Yes, sir.

Q. Did they have some speaker boxes?

A. I never seen no speaker box, no speakers, just a few radios.

Q. And did they have some wheels?

A. No, they didn't have no wheels.

Q. Were they actually working on -- working on any cars when you were there?

A. No, cause they was trying to get they business started.

Q. Yeah, but the place was -- I mean, they were in there. They had their cabinets put up. They had -- did they have a sound room put together and everything like that?

A. No, the sound room wasn't even up.

Q. Okay. But the place was cleaned up. They were fixing it up. It looked nice?

A. Yes, sir.

Q. And you got out of jail on July 13, 2000?

A. Yes, sir.

Q. And so you went by B & M how much -- how many days after you got out of jail in July of 2000 did you go by B & M?

A. Probably a couple of -- probably a couple of months after.

Q. Went by there in September? If you got out of jail in July, July, August, September?

A. Somewhere around there.

Q. Okay. And at that time they had more inventory, things were up? That was over a year later.

A. Yeah, yeah, they had a few cars there. They was doing way better than a year's time.

Q. They had some inventory?

A. Yeah, they had more inventory.

Q. Had wheels?

A. No, I never seen no wheels.

Q. No wheels, okay. Had stereos and speaker boxes and things like that?

A. Yes, sir.

[rec. doc. 541, tr. pg. 391-394].

At that point, outside the presence of the jury, Goode moved for "either a mistrial or to have the testimony of Mr. Alexander struck from the record on the basis of prosecutorial misconduct." [rec. doc. 541, tr. pg. 399-401].

Goode argued that since the execution of a search warrant for B & M on July 20, 2006, "the government had in its possession proof that Mr. Alexander's testimony that he went to B & M Auto Sound and 4x4 in 1999 is false", because B & M Auto Sound and 4x4 did not come into existence and open its doors until October 2, 2000. They were not physically there." [*Id.* at 401].  Goode's argument was premised on the government having a copy of a document showing that B & M was not incorporated until August of 2000[1], and a lease indicating that the premises where B & M was eventually located, at 1909 Jefferson Street, was not leased until March 1, 2000.[2]  Goode argued that despite having these documents, AUSA Grayson elicited Alexander's allegedly false testimony to the effect that Alexander had visited the premises in 1999, when that was not possible.

Goode argued that this testimony was material because this was the government's evidence of when Wyatt gained guilty knowledge that Alexander was a drug dealer, and that Wyatt therefore knew the purpose of the secret compartments when he later began installing them in Alexander's vehicles.

---

[1] *See* D 29 and D 30, the Louisiana Secretary of State's Unofficial Detail Record dated May 28, 2004, and the Louisiana Secretary of State's Detailed Record dated November 7, 2006.

[2] *See* G 2.

Goode argued that the government solicited Alexander's testimony, which the government should have known was inaccurate, in contravention of the government's obligation to corroborate and investigate the truth of a witness's testimony prior to presenting the testimony to the jury. [*Id.* at tr. pgs. 400-410].

In response, AUSA Grayson argued that Alexander could have made a mistake as to when events occurred and, further, that the government had interviews of Neveu indicating that it was not until after Alexander returned from prison (in late 2000 or early 2001) that they (Neveu and Wyatt) learned that Alexander had been in prison, and therefore this portion of Alexander's testimony was of no moment.  [*Id.* at 410].

AUSA Grayson further argued that although the agents might have seized the documents to which Goode referred, he had not personally reviewed all of the documents which had been seized. [*Id.* at 412-414].  AUSA Grayson also argued that a business can operate without being incorporated, and that the government had interviews and grand jury testimony of Deborah McKnight and Jennifer (Neveu) McKnight  which indicated that while Neveu and Wyatt were still working for Ricky Smith Audio, they were, at night, trying to start their own business. [*Id.* at 412 and 426-427].  Finally, AUSA Grayson noted that he had not had the opportunity to rehabilitate the witness, Alexander, to explore whether Alexander was in error as to the location that he initially had contact with Wyatt. [*Id.* at 415-416].

The Court replied as follows:

**10**

I'm not certain that this is something that should be rehabilitated. I'm going to have to give this some thought, Mr. Grayson. Granted, Mr. Alexander could have made a mistake. Things truncate in our minds, you know, they do, they truncate. That happens a lot, as I said. I can't remember which year it was that we gave my mother the Arkansas razorback pig. So it could be that it was a mistake.

However, that's not the issue here entirely. The issue here is that the government, according to Mr. Goode, had in your possession with your case agent, from the information they seized from B & M, that points out that Mr. Alexander's testimony was false. So it shouldn't have been put on to begin with.

That is to say, I can put them up there and have them say false testimony and then come back and try to rehabilitate them after it's pointed out to me. No, that's not the way it works.

It would be different if you did not have this information in your possession. It would be different if this were not a pivotal point. And until Mr. Goode made his argument, I was thinking it was just tangential, but he's right. You brought out with Mr. Alexander, in order to begin the odyssey of knowledge on the part of Mr. Wyatt, you brought out with Mr. Alexander that he, Mr. Alexander, went to B & M before Mr. Alexander surrendered in 1999 for the marijuana charge, and then you asked the question, did they know, and his response was one of his more speculative responses, as I remember it, well, of course, they had to have known, okay? When, in fact, you had, the government had in your possession information that established this could not have happened. That is the problem, Mr. Grayson. And the only response I'm getting from you here is, well, I didn't know what was in all those boxes that my case agent knew and had. You're trying to insulate yourself, i.e., the U. S. Attorney's Office, from the people who bring you the information and tell you that this is the information that you take to the grand jury or thereafter, cause this happened thereafter, you know, you took it to the grand jury, had Mr. Wyatt among others indicted, and then you want to say, well, I want to insulate myself because I, U. S. Attorney, didn't know what my agent knew, and my agent knew it because he took it from B & M, and yet there was information that my agent knew, that I therefore am imputed with that knowledge, and yet I put someone on the stand to testify to something that could not have happened. That gives this Court grave concern.

11

So unless I'm not understanding your argument, because right now there are two arguments I'm hearing from you. First is that we, the U. S. Attorney's Office, didn't know what was in those boxes. Nope, those boxes were your agents, and you had them and you seized them, *et cetera.*

The other one is you haven't had a chance to rehabilitate him. Well, you can't put him up there and then try to -- and have him testify to something you knew if I, you know, suggest that that knowledge is something you should have known, you knew was false and get a chance to rehabilitate him. That gives me concern.

[rec. doc. 541, tr. pg. 417-419].

With respect to AUSA Grayson's argument that people frequently make mistakes as to when events occur, the Court said:

Yes, and I agree on that, and I like my remarks there too because I think that makes an excellent point, but that is separate and apart from your putting him on the stand and asking him questions about something that, given the information that you had in your possession, you knew could not have happened. That's the problem. And if it were just tangential, probably not an issue here, but it's not. It is the beginning of knowledge.

[rec. doc. 540, tr. pgs. 419-420].

In response to Goode's argument that Alexander would not have mistaken the correct date of his first encounter with Wyatt because it was the only time that he had ever gone to prison, the Court added to following comments:

But that goes to the secondary issue, and that secondary issue is whether or not Mr. Alexander is deliberately misstating the information, and that's a secondary issue. I'm not suggesting it is not equally important, but it's just not the one we are discussing at this point.

Your motion is not based upon the fact that you think that he's committing perjury. That's the argument one makes to the jury, and that's the truncating of the memory, *et cetera*. I think you would lose on that one. The more

**12**

immediate problem is that you are saying that the government put a witness on the stand and elicited from that witness relevant testimony as to knowledge as to your client when knowledge is the linchpin, when the government had in their possession documents that they had in fact seized from your client that establish that it could not have happened, certainly not at the time that he says.

And in fact, the inference on knowledge as to -- I mean, his stopping -- his, Mr. Alexander, stopping by there is of no moment one way or the other. Why it is of moment is because he was on his way to jail on a drug charge, and that begins the guilty knowledge, perhaps, on the part of Mr. Wyatt. And the government had in its possession information that would establish that it would have been impossible for Mr. Alexander to have stopped on his way to prison. Now he could have done it when he came out, which is what Mr. Grayson argues Mr. Neveu will testify, but if you knew that Mr. Neveu was going to say that it was after he got out of prison, then it would seem it would have been, at least, incumbent upon the government to double-check that fact.

[rec. doc. 540, tr. pgs. 420-421].

The Court then asked Goode what remedy he was requesting, to which Goode responded mistrial, based on the fact that Alexander "is key to the government's case against my client [and t]he harm that this jury has heard from this guy talking about my client and the knowledge he had. . . ." [*Id*. at 421-422].

The Court stopped Goode stating:

Well, but now you're blending things again. You are suggesting that, in fact, Mr. Alexander is lying. I don't know whether he's lying or he's not lying or he truncated his facts, okay. You know, whether it was before or after, you know, I don't know. Sometimes our memory does that to us.

So what has been put forth as to your client at this time as to this testimony, and that is, the business that, as of that date, Mr. Alexander suggests that Mr. Wyatt knew that he, Mr. Alexander, was a drug dealer. That can be corrected by cross-examination and in closing argument. That can be

addressed and corrected and just completely undercut Mr. Alexander's credibility certainly on that point and maybe on all the other points. So that can be corrected on cross.

Then the question becomes what remedy, if any, is due given the government having had this information in their possession. And from the last time we've addressed this concept, the Fifth Circuit is pretty much clear that it will take something much more egregious than this to allow -- that would be the dismissal of an indictment. Mistrial might be a different, a little bit different standard, because whether I agree with it or not, I'm bound by the Fifth Circuit jurisprudence. And the activities of the prosecutor in Texas that is sort of the seminal case on this, to me, would have been sufficient to have dismissed the indictment and the Fifth Circuit said, no, that's not sufficient.

Other sanctions can come into play and can be, can be made available. So I'm going to think about this, but I deliberately thought out loud so you would have sense of it as would the government.

As to Mr. Alexander, whether he's committing perjury or not, I don't know, quite frankly, I don't know. But certainly -- I mean, he could remember it incorrectly, but that can be dealt with on cross, cause as you said, you walked him down the plank. So you can come back and cut the plank out from under him once you get your documents in, so that can be corrected.

And it gives you a very strong argument as to credibility as to the government's major witness. Then what sanction, if any, as to the government would be what would be left with the Court, and I am not certain, as I sit here, without having looked at any of the jurisprudence, but I am not certain that the Fifth Circuit would allow a mistrial based upon this particular conduct. . . .

[*Id*. at 422-423].

The Court then said:

This should not have happened. It's as simple as that. It should not happen. You ought to know your files. You ought not put a witness on the stand to testify to something that you know could not have happened. The mere fact that you can at this point say, well, it could have been that he was thinking

about another location, it could have been, no, no. You have documents that tell you that this was not available to these gentlemen until March of 2000, and you put a witness on the stand to say that he went to these premises in 1999. I don't know how we get around that fact. So that shouldn't have happened.

Now, whether or not under Fifth Circuit jurisprudence that's sufficient for a mistrial, I'm not certain that it is. I'm going to go look, all right? However, what the Fifth Circuit looks to in mistrials, . . . the jurisprudence is clear that, if there's a way that it can be corrected and salvaged and prejudice not be to the defendants, that the case law argues that that should be the case. But I'm going to go look at it and make certain.

[*Id*. at 429-430].

When the Court reconvened, AUSA Grayson stated that his case agents had been told, during the recess, by Jennifer (Neveu) McKnight and Deborah McKnight that in 1999 the Jefferson Street location was "being utilized" by B & M, as the premises was being prepared for opening the business.  AUSA Grayson further indicated that Deborah McKnight was present and available to testify to those facts. [*Id*. at 432-433].

Deborah McKnight then took the stand and testified on direct examination by AUSA Grayson, in pertinent part, as follows:

Q. Do you know when it was that Barry and Mike started their business?
A. Officially B & M, 2000.
Q. Prior to that had they been preparing the business?
A. Yes, sir.
Q. When was that?
A. 1999.
Q. And at -- was it at that same location where they are currently or a nearby location?
A. Same location.

[rec. doc. 541, tr. pg. 434-435].

15

On cross-examination by Goode, Deborah McKnight confirmed her testimony that

Neveu and Alexander had, in fact, begun preparing the 1909 Jefferson Street location for

business in 1999, prior to obtaining a lease for that location as follows:

> Q. Ms. McKnight, I have in my hand the original lease for the premises --
> A. Uh-huh.
> Q. -- where the business is located now, which states that the occupancy starts on the 1st day of March, 2000.
> A. Uh-huh, but they were in there before preparing the building, not actually installing, but they were on that site, cleaning the building up to open the business.
> Q. Before they had occupancy under the lease they were over there?
> A. As far as I know, yes.
> Q. Did they have inventory in there at that time? Did they have stereos?
> A. I think they were just cleaning up. I mean, they were trying to get the business open. They were on that other side from where they are right now, the big side, cleaning it up.
> Q. Prior to having occupancy?
> A. As far as I know, yes, they would go at night and do it.
> Q. And they didn't have any stereos or stuff like that for sale, did they?
> A. I couldn't honestly tell you that cause I only went there a couple of times with my daughter. I really -- I couldn't tell you truthfully if they had inventory or not.
> Q. Were they selling merchandise and installing merchandise in cars at that time?
> A. I wasn't there enough to know if they were doing it. Now my son-in-law installed some stuff in my car over there, but I don't know if it's something he had on hand or what.
> Q. What is it -- what information do you have that allows you to recall 1999? What day, what month?
> A. I couldn't tell you the month. I just know I was there. I went there before 2000.
> Q. So you don't know which month, right?
> A. I have no idea what month.
> Q. You don't know which day.
> A. That was in 1999.
> Q. (By Mr. Goode) Did you keep a diary?
> A. A what?

Q. A diary.

A. No, sir.

Q. How could they be in there working if they did not have legal occupancy until -- in 1999, when they did not have legal occupancy until March 1st of 2000?

A. You would have to ask who they rent -- got the building from. I don't know. I don't know any of the particulars. I just know they were in there cleaning the building up.

Q. So they were cleaning the building up, but they were not open at all for business?

A. Not officially, no.

[rec. doc. 541, tr. pg. 435-437].

In response to Goode's suggestion that Wyatt testify on this limited point, AUSA Grayson stated that "Jennifer Neveu also has information that would corroborate her mother." [*Id.* at 438]. The Court then made the following observations:

THE COURT: . . . for purposes of this hearing, with the determination that the Court has to make at this time on the motion, if I have witnesses who say that, yes, they were operating out of that building and, in fact, he did do -- someone did do work at that building on a vehicle, i.e., she said her son-in-law did work on her car at that building in 1999, okay, so there would have been some things around, and as I recall, Mr. Alexander's testimony, when asked, he said, no, they were just getting started. There wasn't a lot there. There wasn't a lot of inventory, *et cetera*, all right. Then even if Mr. Wyatt were to take the stand and say, no, that never happened, then we have two different sets of testimony, and that's a matter that would go to the jury, you see. It would certainly not be a matter that would grant you the mistrial that you're asking for at this point in time.

So the question becomes would it be of benefit to you at this time to take the risk of putting Mr. Wyatt on the stand, I don't know. Cannot speak to that. Do not suggest one way or the other. But Mr. Grayson would like to put on Ms. Neveu on this limited point, and we can do that, and then you can make your determination at that time.

[rec. doc. 541, tr. pg. 438-439].

17

AUSA Grayson then informed the Court that Jennifer (Neveu) McKnight was not in the courthouse but that he could get her "[i]f the Court thinks it's necessary since we now have someone to corroborate Mr. Eric Alexander's testimony concerning a potential meeting in 1999 which undercuts the basis for the defense motion." [*Id*. at 439-440].

The Court then denied Goode's motion for a mistrial, in pertinent part, as follows:

THE COURT: . . . Now there are a couple of ways that this Court can go forward. . . . However, at this time I will tell you what I had intended to do prior to the testimony of Ms. McKnight was to take this matter under advisement, have full briefs by all parties, and I would defer ruling until I had opportunity to read the briefs and have opportunity to give it considered thought. Now that's what I intended to do.

Now, in part, because the problem with credibility in part, perhaps, could be dealt with by cross-examination and, in fact, might be the best shot that the defendant would or would not have in this matter, because as I intimated before, I cannot imagine that this particular incident, and I will just use that generic term, would allow for a mistrial and dismissal with prejudice. It's just not going to rise to the level of the standard for prosecutorial misconduct that would allow for dismissal of an indictment. Even cobbling together the collective of arguments that the defense has made, particularly, on behalf of Mr. Wyatt vis-a-vis Mr. Catalan and then vis-a-vis Mr. Grayson, cobbling all three together -- while I was out I was doing some research on the fact -- I don't think that's going to rise to the level.

And quite frankly, if the conduct of the prosecution in the case that I had in Celestine did not rise to the level of dismissal with prejudice, then I cannot imagine that it would have happened here.

So what that means is, is that even if the Court declared a mistrial at this time as to the Mr. Wyatt, notwithstanding the other two because they are together, but of course as to Mr. Wyatt, the likelihood is you're going to turn around and get tried again. You're going to have to pick a jury again. You're going to have a different jury. And you're going to have the opportunity to be tried again, and the government's not going to make this mistake again. It's not going to happen.

Now the question then is, would that prejudice the defendant? Well, the
defendant would have been the one who had asked for the mistrial. So I'm
not convinced that necessarily a mistrial is your best avenue here to deal
with what you suggest is prosecutorial misconduct, but at least Mr. Wyatt,
not Mr. Valdez, and not Ms. Eaglin, have asked for a mistrial.

Now, that having been said, the Court gave serious consideration to it, but I
was not going to declare a mistrial without having full briefing by both
sides so I would have the opportunity to give complete thought to all the
allegations that have been made in this case, as to whether or not a mistrial
should flow.

But even, as I said, even if I declared a mistrial, the likelihood is the
government will just come back and try you again, Mr. Wyatt. And they
would have the right to do that. I do not believe under existing
jurisprudence -- I could be wrong, but I do not believe under existing
jurisprudence within the Fifth Circuit Court of Appeals and the United
States Supreme Court, that the alleged conduct here would rise to the level
where the dismissal could or should be one with prejudice. So it just means
we go through this exercise again, okay?

So the question then was, what prejudice would you, Mr. Wyatt, since
you're the only one who has made the motion at this time, what prejudice
would you experience in going through letting me defer, going through and
let's see if this prejudice in fact can be remedied, and if it can be remedied
and perhaps you get acquitted, that does it.

If it can't be remedied, then the Court would have at that time had full
briefing and would have considered whether or not to declare a mistrial
based upon what had occurred.

However, after having decided that would likely be where I would go, the
government has now put on Ms. McKnight. Now, with putting on Ms.
McKnight, she says that you and Mr. Neveu were there at that location
doing work of some sort, cleaning it up, and that Mr. Neveu did work on
her car, did some outfitting I believe she said -- I forget the term she used --
on her car at that location in 1999.

Mr. Alexander was rather clear, it was one of the few things he was
somewhat rather clear on, and that was that, when he went the first time,

**19**

that you-all were, quote, just getting started, I believe, were his words, and that, in fact, there wasn't much there when asked, okay?

So at that point we certainly are not looking at a situation where they are necessarily in contradiction in light of Ms. McKnight's testimony, and the distinction and difference being that it seems, according to Ms. McKnight, at least, you and Mr. Neveu occupied the premises and were actually doing some operations, albeit cleaning or for family, out of that location prior to the beginning of the lease and, in fact, in 1999. So with that, that would seem that it's a matter for the jury.

Now, to the extent that the government perhaps could or should have been aware of the fact that the lease did not begin until that certain point in time and that, in fact, whether or not Mr. Alexander was accurate or not, that still remains, and the Court's comments as to being aware of what's in one's file before one puts a witness on the stand still stands. Now, that having been said, at this point, in light of Ms. McKnight's testimony, the Court is not inclined to grant the mistrial, and we can go forward.

Now I don't think I need hear Ms. Neveu, nor need hear Mr. Wyatt, because even if Mr. Wyatt were to take the stand and say, no, we didn't do that, then we just merely have a contradiction in testimony. So -- which would allow, could have allowed for what Mr. Alexander has testified to, and that's not a matter by which this Court should take it away from the jury because the court in *Tommy McNeal versus William Hollowell*, 481 F.2d 1145 -- it's a 1973 case, but on the quick run on research I did, it seems to still be good law. At page 1150 the court, the appellate court says as follows:

"The first generalization is that a trial judge correctly declares a mistrial when, in his or her discretion, 'an impartial verdict cannot be reached or . . . a verdict of conviction could be reached but would have to be reversed on appeal due to an obvious procedural error in the trial,'" citing *Somerville*, *supra*, 93 S.Ct. at 1070.

Now it goes on to talk about it was a potentially prejudiced juror in that matter. So the facts are not the same, but they did get into the aspect, again, at page 1150.

"The second line of precedent recognized in *Somerville,* however, is potentially more useful to us. The Supreme Court there noted that the

declaration of a mistrial based on 'a rule or a defective procedure that [lends] itself to prosecutorial manipulation' would be an entirely different case." And it cites 93 S.Ct. at 1073. "Presumably such a case would require the invocation of the Fifth Amendment's bar to reprosecution," *et cetera*.

I think they are alluding to there if the government goaded one into a mistrial. I have not gone back and reread that Supreme Court case. But there is no indication here that the government goaded it. In fact, the government does not want a mistrial. Mr. Grayson is adamant about that point, and the government suggests that -- and this is the Court's paraphrasing of Mr. Grayson's remarks earlier -- either he was unaware of what was in the lease because it was in the voluminous amount of materials that the case agent had but not brought to Mr. Grayson's attention, or Mr. Grayson just did not recognize the significance of that, and when brought to his attention today, argued what, in fact, he has brought forth, which is Ms. McKnight and then later Ms. Neveu's testimony, who indicated that, in fact, Mr. Alexander could have done what he said he did because they are of the opinion that activities were being conducted at the premises at that time.

They are also, the government is aware, based upon what Mr. Grayson said, that Mr. Barry Neveu indicated that, yes, Mr. Alexander did come by, but it was actually after he got out of prison, and Mr. Grayson suggests he felt that was of no moment when it occurred because the same guilty knowledge would have attached, whether Mr. Alexander was going to prison or in fact coming out of prison because then he did allegedly, Mr. Alexander, stop by, and in a manner by which the government argues, Mr. Wyatt would have known or should have known that Mr. Alexander was either on his way to prison or coming from prison. So with that, I do not think the standard for mistrial is found.

Now, but for Ms. McKnight's testimony, the Court would have been doing exactly what I had suggested. I would have deferred. I would have asked for full briefing. I would have allowed the matter to go forward, and I would have made a determination after I received the full briefing. All right. So that will be the Court's ruling on the motion for mistrial, Mr. Goode.

*          *          *

. . . And it should not be lost on all involved that, even if this Court declared a mistrial, this Court is rather certain that, based upon all the circumstances

in this matter, that this is not a case that would rise to the level where the dismissal would be with prejudice and dismissal of indictment.

So the best that could happen is that you would just start this process over again with picking of another jury and start the trial again, and it's not likely the government would make this mistake again. Now -- if it were a mistake, all right?

So that is why I felt there would be no harm in deferring until after we saw what occurred, whether the prejudice could be remedied and had full briefing on the matter.

 [rec. doc. 541, tr. pg. 440-447].

The Court then took up other matters and recessed for the day.  When court resumed on the third day of trial, January 23, 2009, Valdez' attorney, Mr. Wolfe, was not present.  After conducting an investigation, the Court determined that a medical condition precluded Mr. Wolfe from continuing trial at that time.  The government moved to sever Valdez, or, alternatively, moved for a mistrial only as to Valdez.  Wyatt, Eaglin and Valdez moved for a mistrial.  The court denied the government's motion, and granted the defendants' motion for a mistrial, without prejudice. [rec. doc. 525].

On May 23, 2011, both Valdez and Wyatt filed Motions to Dismiss the original and superceding indictments based on alleged prosecutorial misconduct. [rec. docs. 828 and 829].

On September 14, 2011, Valdez was named in a second superceding indictment again charging him with conspiracy to possess with intent to distribute cocaine, cocaine base and marijuana in violation of 21 U.S.C. § 846 (Count 1).  [rec. doc. 911].

The second superceding indictment alleges that Valdez knowingly and intentionally conspired with Alexander, Victor Luna Valdez, Sabina Luna Valdez and several others, to possess with intent to distribute cocaine, cocaine base and marijuana, the object of the conspiracy being an illegal scheme for profit involving the procurement, smuggling and transportation of cocaine and marijuana from Mexico into the United States through the Rio Grande Valley in Texas into this district, and the subsequent distribution to other locations in the United States.  The conspiracy is alleged to have been accomplished by the smuggling of controlled substances from Mexico into this country  by Valdez, Victor Luna Valdez, Sabina Luna Valdez and several others, and then using a variety of vehicles, including tractor-trailers to transport the controlled substances from the Rio Grande Valley in Texas to various distribution points in the United States, including this district.

The overt acts in which Valdez is named mirror those in the original and first superceding indictment.  However, the overt acts were re-designated and contain several textural changes.

Specifically, overt act (a) alleges that on February 11, 2003, Valdez possessed marijuana in Arkansas. There no longer is any mention of Valdez having possessed cocaine.

Overt act (b) (formerly (d)), alleges that on April 27, 2004, Valdez, Victor Luna Valdez and Sabina Luna Valdez visited the residence of Alexander.  As was the case with

the first superceding indictment, there is no mention of Francisca Wiltz Alexander being a resident of the location visited.

Overt act (c) (formerly (f)) alleges that on May 21, 2004, Valdez, Victor Luna Valdez and Sabina Luna Valdez again visited the residence of Alexander.  As was the case with the first superceding indictment, there is no mention of Francisca Wiltz Alexander being a resident of the location visited.

Overt act (d) (formerly (j)) alleges that on November 26, 2004, Valdez was a passenger in a vehicle with Victor Luna Valdez and Sabina Luna Valdez, which was entering the United States from Mexico, wherein Sabina Luna Valdez was found to have been carrying on her person six kilograms of cocaine and three grams of cocaine base.

Overt acts (l) and (m) (formerly (p) and (q)) allege that on April 23, 2006 and May 20, 2006, respectively, tractor-trailer trucks titled to Valdez, were stopped and found to be carrying $961,155.00 and 335 kilograms of marijuana, respectively.

The second superceding indictment was returned by a different grand jury than that which heard the evidence and returned the original and first superceding indictments. Moreover, the evidence was presented to that grand jury by a different AUSA, John Luke Walker.

Wyatt was not named as a defendant in the second superceding indictment. Accordingly, there is no mention of the knowing creation of hidden compartments in vehicles used to transport illegal drugs into this district by Wyatt or his business partner

24

Neveu, nor any mention of the manufacture or installation of these hidden compartments by Wyatt or Neveu at B & M.

After the second superceding indictment was returned, the government informed the Court that the government and the defendant, Wyatt, had agreed to dispose of the charges against Wyatt with a pretrial diversion agreement, effectively rendering the pending motion by Wyatt moot. [*See* rec. doc. 907, p. 2, fn. 2]. Accordingly, Wyatt's previously filed Motion to Dismiss based on prosecutorial misconduct was held in abeyance, pending notification of the Court by the parties that the pretrial diversion agreement was finally binding. After confirming that Wyatt had been accepted for pretrial diversion, the Court dismissed Wyatt's Motion to Dismiss as moot. [rec. docs. 908, 972 and 976].

On September 20, 2011, Valdez filed the instant Motion to Dismiss the pending second superseding indictment. [rec. doc. 919].

Given the return of the second superseding indictment and the government's acknowledgment that it intends to proceed solely on the conspiracy charge alleged in the second superceding indictment, Valdez' Motion to Dismiss the original and first superceding indictments was denied and dismissed as moot, because these indictments effectively no longer exist. Valdez' right to present evidence in support of all arguments asserted in the instant Motion to Dismiss the second superseding indictment was reserved. [rec. docs. 952 and 973].

25

<u>**LAW AND ANALYSIS**</u>

**DISMISSAL FOR SELECTIVE PROSECUTION**

Valdez argues that he has been subjected to unconstitutional selective prosecution because the government has indicted four members of the immediate Valdez family (Valdez, Sabina Luna Valdez, Maria Aide Delgado, and Victor Luna Valdez), and one friend of the Valdez family (Ana Maria Montoya), all of whom are Hispanics from the south Texas border region, while choosing not to indict other Hispanics from the south Texas border region, who supplied controlled substances to Eric Alexander and participated in the charged drug conspiracy, committing overt acts similar to, and more egregious than, those allegedly committed by Valdez: un-indicted co-conspirators Emilio Aguierre, Isabel Cordova, Cristina Uvalle, Cesar Zapata and others not listed as unindicted co-conspirators – Marcelino Dominguez, Richard Montoya, Jr., Richard Montoya, Sr., Felipe Aranda, Rogelio Gonzalez, Chino, Easy, Martin LNA, Frederico Francisco (the driver of a truck owned by Valdez from which cash was seized), an unidentified driver of a truck owned by Valdez from which marijuana was seized and an unidentified Hispanic female who was a passenger in the vehicle mentioned in overt act (b) of the second superceding indictment. Thus, in essence, Valdez alleges that the government selectively prosecuted the Valdez family, because they were indicted and other Hispanics, not in the Valdez family, were not indicted.

"[S]o long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision, whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." *Bordenkircher v. Hayes*, 434 U.S. 357, 364, 98 S.Ct. 663, 668, 54 L.Ed.2d 604 (1978). Accordingly, the decision to prosecute one person and not another is a proper exercise of executive prosecutorial discretion with which the courts are hesitant to interfere. *United States v. Webster*, 162 F.3d 308, 333 (5th Cir. 1998) *citing United States v. Hoover*, 727 F.2d 387, 389 (5th Cir. 1984). However, the exercise of prosecutorial discretion is limited by the Equal Protection Clause. *In re United States*, 397 F.3d 274, 284 (5th Cir. 2005).

A court's consideration of an Equal Protection-based claim of selective prosecution necessarily begins with a presumption of good faith and constitutional compliance by the prosecutors. *Id. citing United States v. Armstrong,* 517 U.S. 456, 465-466, 116 S.Ct. 1480, 1486-1487, 134 L.Ed.2d 687 (1996). To overcome the presumption that the government made its decision to prosecute in good faith and in a non-discriminatory manner, a defendant must prove both discriminatory effect and discriminatory purpose by presenting "clear evidence". *Id. citing Armstrong,* 517 U.S. at 465, 116 S.Ct. at 1486 *quoting United States v. Chemical Foundation, Inc*., 272 U.S. 1, 14-15, 47 S.Ct. 1, 6, 71 L.Ed. 131 (1926); *Webster*, 162 F.3d at 334.

To establish that the government has engaged in unconstitutionally discriminatory selective prosecution, a defendant must make out a *prima facie* case. A *prima facie*

constitutional case of selective prosecution requires the criminal defendant to bring forward some evidence that similarly situated individuals of a *different* race could have been prosecuted, but were not. *In re United States*, 397 F.3d at 284 *citing Armstrong,* 517 U.S. at 465, 116 S.Ct. at 1487 and *Webster*, 162 F.3d at 333-34 (emphasis added).[3]

Valdez is Hispanic.  He argues, not that he was treated differently than non-Hispanic individuals, but, rather, that he was treated differently than other Hispanic individuals not in his family.  As such, he fails to make a *prima facie* constitutional case of selective prosecution.

Furthermore, the government offered non-discriminatory reasons for not proceeding against several of the Hispanic unindicted co-conspirators in the present indictment.  Special Agent Catalan ("Agent Catalan") testified that Emilio Aguierre and Cristina Uvalle were prosecuted for their acts in state court and that Isabel Cordova and Cesar Zapata were previously prosecuted for their acts in this court. This court's records

---

[3]The *Webster* court set forth the required showing as follows:
To establish that the government has engaged in unconstitutionally discriminatory selective prosecution, a defendant must make a two-pronged showing.  First, he needs to make out a *prima facie* showing that he has been singled out for prosecution but others similarly situated of a different race were not prosecuted. *See United States v. Armstrong,* 517 U.S. 456, 465, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996); *United States v. Sparks*, 2 F.3d 574, 580 (5th Cir. 1993); *Hoover*, 727 F.2d at 389. In *Armstrong*, the Court stated, "The vast majority of Courts of Appeals require the defendant to produce some evidence that similarly situated defendants of other races could have been prosecuted, but were not, and this requirement is consistent with our equal protection case law." *Armstrong*, 517 U.S. at 469, 116 S.Ct. 1480. Second, he must demonstrate that the discriminatory selection of him for prosecution is invidious or in bad faith, in that it rests on such impermissible considerations as race, religion, or the desire to prevent his exercise of his constitutional rights. *See Sparks*, 2 F.3d at 580; *Hoover*, 727 F.2d at 389. *Webster*, 162 F.3d at 333-334.

confirm Agent Catalan's testimony on this point. (*See* 6:04-cr-60043;  6:04-cr-60044).

Agent Catalan also testified that he has not learned anything to make him suspect that the unindicted Hispanic female passenger in the vehicle mentioned in overt act (b) of the second superceding indictment had any relevant role in the charged conspiracy, and that, likewise to his knowledge, Felipe Aranda had nothing to do with this conspiracy. Finally, Agent Catalan testified that he does not know the proper names of either Chino or Easy.

Agent Catalan's testimony was supported by that of AUSA Grayson who testified that the government does not have the "true name" of some of the un-indicted co-conspirators and others are residents of Mexico.  Moreover, AUSA Grayson testified that the government does not have sufficient information to indicate what, if any, role some of these people had in the charged conspiracy, other than the fact that they were present in some of the incidents that are alleged as overt acts in the indictment.

For these reasons, Valdez' Motion to Dismiss based on unconstitutional selective prosecution should be denied.[4]

**DISMISSAL UNDER THIS COURT'S SUPERVISORY POWERS**

---

[4]It is certainly possible that a well supported allegation of selective prosecution could be made out for unconstitutionally disparate treatment of a protected class other than race, such as, for instance religion.  Simply stated, Valdez fails to make a *prima facie* case of unconstitutional selective prosecution based on any protected class.  Valdez has offered no authority, and the Court knows of none, that one's family is a constitutionally protected class.

Valdez argues that this Court should dismiss the second superceding indictment under this Court's supervisory powers based on alleged prosecutorial misconduct.  More specifically, Valdez argues that dismissal is proper because the prosecution has knowingly allowed the entry of false information into the record of these proceedings, presented false testimony to the grand jury which returned the original and first superceding indictments and suborned perjury before the grand jury and during the January 2009 trial.  These claims are addressed below.

Initially, the court notes that, "[i]t is axiomatic that the grand jury sits not to determine guilt or innocence, but to assess whether there is adequate basis for bringing a criminal charge."  *United States v. Williams*, 504 U.S. 36, 51, 112 S.Ct. 1735 (1992) *citing United States v. Calandra*, 414 U.S. 338, 343, 94 S.Ct. 613, 617, 38 L.Ed.2d 561 (1974).  Thus, the Supreme Court has long held that an indictment returned by a legally constituted and unbiased grand jury "is not subject to challenge on the ground that the grand jury acted on the basis of inadequate or incompetent evidence." *Calandra*, 414 U.S. at 363; *see also United States v. Johnson*, 615 F.2d 1125, 1127 (5th Cir. 1980).

To allow such a challenge "would run counter to the whole history of the grand jury institution[,] [and] [n]either justice nor the concept of a fair trial requires [it]." *Williams*, 504 U.S. at 54-55 *citing Costello v. United States*, 350 U.S. 359, 364, 76 S.Ct.

406 (1956).[5]  The Court explained that "[i]t would make little sense . . . to abstain from reviewing the evidentiary support for the grand jury's judgment while scrutinizing the sufficiency of the prosecutor's presentation . . . [because a] complaint about the quality or adequacy of the evidence can always be recast as a complaint that the prosecutor's presentation was "incomplete" or "misleading." *Williams*, 594 U.S. at 54. Therefore, a facially valid indictment returned by a duly constituted grand jury suffices to call for a trial on the merits of the charges set forth therein.  *Lawn v. United States,* 355 U.S. 339, 349-350, 78 S.Ct. 311 (1958) *citing Holt v. United States*, 218 U.S. 245, 247, 31 S.Ct. 2, 4, 54 L.Ed. 1021, (1910) and *Costello*, 350 U.S. at 363; *United States v. Mann,* 517 F.2d 259, 267 (5th Cir. 1975) *citing Costello*, 350 U.S. at 363.

Valdez relies on this Court's supervisory power to dismiss the second superceding indictment. Courts in the exercise its their supervisory power may formulate procedural rules for establishing and maintaining civilized standards of procedure and evidence, beyond those minimal safeguards generally regarded as due process of law. *McNabb v. United States*, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943); *see also United States v. Hasting*, 461 U.S. 499, 505, 103 S.Ct. 1974, 1978, 76 L.Ed.2d 96 (1983) (a federal court

---

[5]This principle was reaffirmed in *Bank of Nova Scotia*, wherein the Court held that "the mere fact that evidence itself is unreliable is not sufficient to require a dismissal of the indictment," and that "a challenge to the reliability or competence of the evidence presented to the grand jury" will therefore not be heard.  *Bank of Nova Scotia v. United States*, 487 U.S. 250, 261, 108 S.Ct. 2369, 101 L.Ed.2d 228 (1988).

"may, within limits, formulate procedural rules not specifically required by the Constitution or the Congress.").

The Supreme Court cited three underlying purposes that can justify the use of the Court's supervisory power in response to case-related misconduct: "to implement a remedy for violation of recognized rights; to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before the jury; and finally, as a remedy designed to deter illegal conduct." *Hasting*, 461 U.S. at 505 (citations omitted).

However, the Fifth Circuit has repeatedly cautioned that dismissal of an indictment under the court's supervisory power is an "extreme sanction" which may be used *solely* for those cases presenting "extraordinary situations." *United States v. Fulmer,* 722 F.2d 1192, 1195 (5th Cir. 1983); *United States v. Welborn*, 849 F.2d 980, 985 (5th Cir. 1988); *see also United States v. Santana*, 6 F.3d 1, 10 (1st Cir. 1993) ("we have repeatedly cautioned that such powers must be used sparingly") (citations omitted).

Further, a "district court exceeds the proper bounds of its power to order dismissal of an indictment with prejudice when it fails to consider whether less extreme sanctions might maintain the integrity of the court without punishing the United States for a prosecutor's misconduct." *Welborn* 849 F.2d at 985 *citing United States v. Sarcinelli*, 667 F.2d 5, 6-7 (5th Cir. Unit B 1982).

In *United States v. Hasting*, 461 U.S. 499, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983), the Supreme Court held that the court's "supervisory powers to discipline the prosecutors

of its jurisdiction" may not be invoked to reverse a defendant's conviction for

prosecutorial misconduct where the alleged misconduct was harmless and where means

more narrowly tailored to deter objectionable prosecutorial conduct are available.

*Hasting,* 461 U.S. at 505-506.[6]

In *Hasting*, the Court of Appeals, by reversing convictions, sought "to discipline

the prosecutor – and warn other prosecutors – for what it perceived to be continuing

violations of *Griffin*[7] " within the circuit.  *Hasting*, 461 U.S. at 504.  The Supreme Court,

however, held that a court's supervisory powers may not be invoked to avoid the harmless

error rule even for constitutional violations, because "the interests preserved by the

doctrine of harmless error," including the interest of the victims in seeing the defendants

brought to justice and the public's interest in the "prompt administration of justice" . . .

"cannot be so lightly and casually ignored in order to chastise what the court viewed as

prosecutorial overreaching." *Hasting*, 461 U.S. at 507.

The Court also noted that concern for "the integrity of the process carries less

weight" when the error is harmless because, by definition, there is "no 'reasonable

---

[6]The Court noted that more narrowly tailored means of deterrence included "order[ing] the prosecutor to show cause why he should not be disciplined," . . . "asking the Department of Justice to initiate a disciplinary proceeding against him," or "publically chastis[ing] the prosecutor by identifying him in its opinion." *Hasting*, 461 U.S. at 506 n. 5, 103 S.Ct. 1974.

[7] *Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965) (prohibiting references to the defendant's failure to testify).

possibility' that [the error] contributed to the conviction." *Id.*, 461 U.S. at 506 *quoting*

*Fahy v. Connecticut*, 375 U.S. 85, 86-87, 84 S.Ct. 229, 11 L.Ed.2d 171(1963).

It follows, from the Court's holding in *Hasting,* that a court may not exercise its

supervisory power to dismiss an indictment on grounds of prosecutorial misconduct

without also finding prejudice and, only then, when no more narrowly tailored deterrent is

available.

Subsequently, in *Bank of Nova Scotia v. United States*, 487 U.S. 250, 108 S.Ct.

2369, 101 L.Ed.2d 228 (1988), the Court reaffirmed its analysis in *Hasting* and squarely

held that a court has "no authority to dismiss the indictment on the basis of prosecutorial

misconduct absent a finding that petitioners were prejudiced by such misconduct." *Bank*

*of Nova Scotia*, 487 U.S. at 263.  The Court said that the prejudicial inquiry must focus on

whether any violations had an effect on the grand jury's decision to indict.  If violations

substantially influenced the decision to indict, or if there is grave doubt that the decision

to indict was free from such substantial influence, the violations are not harmless.  *Id*. at

487 U.S. at 256 and 263.

Specifically, the Court said that all federal courts are bound by Fed. R. Crim. P.

52(a) to conduct a harmless-error inquiry and that a "court may not invoke supervisory

power to circumvent" that inquiry. *Id*., 487 U.S. at 254-55.  As the Court explained, "[t]he

balance struck by [Rule 52(a)] between societal costs and the rights of the accused may

not casually be overlooked 'because a court has elected to analyze the question under the

supervisory power.'" *Id.*, 487 U.S. at 255 *quoting United States v. Payner*, 447 U.S. 727, 736, 100 S.Ct. 2439, 65 L.Ed.2d 468 (1980). Thus, the Court held that "a district court exceeds its powers in dismissing an indictment for prosecutorial misconduct not prejudicial to the defendant." *Id.*, 487 U.S. at 255.[8]

While the misconduct at issue in *Bank of Nova Scotia* occurred before the grand jury, it seems clear that the analysis used by the Court there also applies in this case, because Valdez seeks dismissal of his indictment based on alleged misconduct before the grand jury and at the initial trial.

The Fifth Circuit has likewise recognized that dismissal under the court's supervisory powers requires a showing of actual prejudice to the accused.  In *United States v. McKenzie*, 678 F.2d 629, 631 (5th Cir. 1982), *rehearing and rehearing en banc den.*, 685 F.2d 1386 (5th Cir. 1982), *cert. den.*, 459 U.S. 1038, 103 S.Ct. 450, 74 L.Ed.2d 605 (1982), the Fifth Circuit recognized that even in the case of the most "egregious prosecutorial misconduct", an indictment may be dismissed only on a showing of actual

_____

[8]Other Supreme Court cases likewise confirm that a court's supervisory power cannot be exercised to dismiss indictments for prosecutorial  misconduct absent a showing of prejudice to the defendant. In the context of a Sixth Amendment violation, the Court has held that "absent demonstrable prejudice, or substantial threat thereof, dismissal of the indictment is plainly inappropriate, even though the violation may have been deliberate." *United States v. Morrison*, 449 U.S. 361, 365, 101 S.Ct. 665 (1981). The Court found that this result was clear from a case involving a violation of the Fifth Amendment, where the government had unconstitutionally acquired incriminating evidence against the defendant, wherein the Court held that "barring the prosecution altogether" was not an appropriate remedy. *United States v. Blue*, 384 U.S. 251, 255, 86 S.Ct. 1416, 1419 (1966).  *See also United States v. Payner*, 447 U.S. 727, 733, 100 S.Ct. 2439, 65 L.Ed.2d 468 (1980) (holding that the district court cannot invoke its supervisory power to circumvent the Fourth Amendment standing requirement by excluding evidence seized illegally and in bad faith by the government in violation of a third party's , but not the defendant's, constitutional rights).

prejudice to the accused.  The court went on to note that the rule was the same, whether the court was acting under its supervisory authority or its duty to protect the constitutional rights of the defendant.  The argument that a different standard should be applied when reviewing the dismissal of an indictment under the court's supervisory powers, rather than on constitutional grounds, was specifically rejected.  *Id.*  The court noted the rule in this Circuit, as regards prosecutorial abuse in the grand jury process, was that an indictment may be dismissed for prosecutorial abuse only when the abuse so biases the grand jury that their votes where based on their bias; only when prosecutorial misconduct amounts to overreaching the will of the grand jury should an indictment be dismissed.  *Id.* at 631, *citing United States v. Cathey*, 591 F.2d 268, 273-274 (5th Cir. 1979).  Accordingly, unless Valdez can show that he suffered actual prejudice as a result of prosecutorial misconduct, no matter how egregious, dismissal of the indictment is not warranted.

This rule has been consistently applied in this circuit. *See United States v. Fulmer,* 722 F.2d 1192, 1195 (5th Cir. 1983) (noting that the "extreme sanction of dismissal of an indictment with prejudice" is appropriate only in "extraordinary situations" . . . "where it has been shown that the governmental misconduct or gross negligence in prosecuting the case has actually prejudiced the defendant."); *United States v. Welborn*, 849 F.2d 980, 985 (5th Cir. 1988) ("the power to impose the extreme sanction of dismissal with prejudice [is proper] only in extraordinary situations and only where the government's misconduct has prejudiced the defendant"); *United States v. Williams*, 874 F.2d 968, 976

36

fn. 23 (5th Cir. 1989) (noting that *Payner*, *Hasting* and *Bank of Nova Scotia* "counsel against use of the supervisory power to control executive conduct rather than to redress cognizable prejudice to a defendant").  *See also United States v. Campagnuolo*, 592 F.2d 852, 865 (5th Cir. 1979) (pre-dating *McKenzie* holding that "we have held that a district judge may dismiss an indictment with prejudice because of misconduct by the government only if that misconduct actually prejudiced the defendant").

Virtually every other circuit to consider the issue after *Hasting* and *Bank of Nova Scotia* has also held that an indictment may not be dismissed based on prosecutorial misconduct, absent a showing of prejudice to the defendant. *See United States v. Derrick*, 163 F.3d 799, 807 (4th Cir. 1998) (vacating dismissal of the defendants' indictment under the court's supervisory power noting that "[w]e, too, have consistently recognized that an indictment may not be dismissed for prosecutorial misconduct absent a showing that the misconduct prejudiced the defendant" and that "the district court's dismissal of the defendants' indictments without a finding of prejudice is directly contrary not only to the precedent of this court, but also to clear and well-established Supreme Court precedent."); *United States v. Van Engel*, 15 F.3d 623, 631-32 (7th Cir. 1993), *abrogation on other grounds recognized by United States v. Canoy,* 38 F.3d 893, 902 (7th Cir. 1994) ( "A federal judge is not authorized to punish the misconduct of a prosecutor by letting the defendant walk, unless the misconduct not only violated the defendant's rights but also prejudiced his defense, and neither condition is satisfied here."); *United States v. Santana*,

6 F.3d 1, 11 (1st Cir. 1993) ("[T]aken together, *Payner, Hasting*, and *Bank of Nova Scotia*

form a trilogy admonishing federal courts to refrain from using the supervisory power to

conform executive conduct to judicially preferred norms by dismissing charges, absent

cognizable prejudice to a particular defendant."); *United States v. Casas,* 425 F.3d 23, 47-

48 (1st Cir. 2005) (holding that a court may invoke its supervisory power only where there

is "a nexus between [the] improper prosecutorial practice and prejudice to the

defendant"); *United States v. Isgro*, 974 F.2d 1091, 1097 (9th Cir. 1992) ("In its recent

jurisprudence . . . the Supreme Court has moved . . . toward a rule that a court should not

use its supervisory powers to mete out punishment absent prejudice to a defendant. . . .

*Hasting* thus unequivocally rejects the idea that a court may sanction the government for

its misconduct without considering first the actual prejudice suffered by the defendant.");

*United States v. Fernandez*, 388 F.3d 1199, 1239 (9th Cir. 2004) (holding that to justify

the exercise of the court's supervisory power prosecutorial misconduct must be flagrant

and cause substantial prejudice to the defendant).[9]

    The sole class of cases excepted from the requirement of demonstrating actual

prejudice are those presenting fundamental, structural errors in which the proceedings

"have been so compromised as to render the proceedings fundamentally unfair, allowing

---

[9]While other Circuits have held that actual prejudice need not be shown in order for an
indictment to be dismissed, these cases pre-date *Hasting* and *Bank of Nova Scotia*.  *See United States v.
Serubo*, 604 F.2d 807, 817 (3d Cir. 1979) and *United States v. McCord*, 509 F.2d 334, 349 (D.C. Cir.
1974)

the presumption of prejudice." *Id.* 487 U.S. at 257 *citing as examples Vasquez v. Hillery*, 474 U.S. 254, 260-264, 106 S.Ct. 617, 621-624, 88 L.Ed.2d 598 (1986) (racial discrimination in selection of grand jurors) and *Ballard v. United States*, 329 U.S. 187, 67 S.Ct. 261, 91 L.Ed. 181 (1946) (exclusion of women from the grand jury).  Structural errors are those which infect the entire trial framework and "necessarily render a trial fundamentally unfair." *Neder v. United States*, 527 U.S. 1, 8, 119 S.Ct. 1827, 1833 (1999) (citations omitted).  However, the Supreme Court has stated that "structural" errors are found in only a "very limited class of cases" and, accordingly, most constitutional errors do not fall within this class of cases.[10]  *Neder*, 527 U.S. at 8.

Valdez relies on two cases from other circuits, both of which pre-date *Hasting* or *Bank of Nova Scotia,* or both, to wit, *United States v. Hogan*, 712 F.2d 757 (2d Cir. 1983) and *United States v. Basurto*, 497 F.2d 781 (9th Cir. 1974).

In *Hogan*, the court reversed the defendants' convictions, holding that the activities of the AUSA in presenting the case to the grand jury "impaired the grand jury's

---

[10]The *Neder* Court identified the following errors as falling within the limited class of errors found to be "structural":  *Johnson v. United States*, 520 U.S. 461, 468, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997) *citing Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963) (complete denial of counsel); *Tumey v. Ohio*, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927) (biased trial judge); *Vasquez v. Hillery*, 474 U.S. 254, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986) (racial discrimination in selection of grand jury); *McKaskle v. Wiggins*, 465 U.S. 168, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984) (denial of self-representation at trial); *Waller v. Georgia*, 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984) (denial of public trial); *Sullivan v. Louisiana*, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993) (defective reasonable-doubt instruction).  *Neder*, 527 U.S. at 8, 119 S.Ct. at 1833.

integrity as an independent body." *Hogan,* 712 F.2d at 762.  The court relied on the law of the Second Circuit, that dismissal of an indictment is justified to achieve either of two objectives: to eliminate prejudice to the defendant, or, pursuant to the supervisory power, to prevent prosecutorial impairment of the grand jury's independent role.  *Id*. at 761.

*Hogan* is inapplicable to this case.  The law of the Second Circuit (as it existed when *Hogan* was decided) is different, and in direct conflict to the law of the Fifth Circuit.  Additionally, the continued validity of *Hoga*n is doubtful, given the Supreme Court's decision in *Hasting* and *Bank of Nova Scotia*.

Finally, the decision of the Supreme Court in *United States v. Mechanik*, 475 U.S. 66, 106 S.Ct. 938, 89 L.Ed.2d 50 (1986) (violation of Fed. R. Crim. P. 6(d) in the presentation of the indictment to the grand jury was rendered harmless by the petit jury's guilty verdict) casts substantial doubt on the continuing validity of *Hogan*, even in the Second Circuit.

In *Basurto*, the court held that where the prosecutor had actual knowledge that the indictment is based partially on perjured testimony, when the perjured testimony is material and when jeopardy has not attached, he is under a duty to immediately inform the court, opposing counsel and the grand jury in order that appropriate action can be taken. The court held that the failure to do so violates the Fifth Amendment Due Process Clause. *Basurto*, 497 F.2d at 785-786.

Whether the court's holding on this issue survives *Mechanik* and *Bank of Nova Scotia* is unclear.  However, pertinent to this case, the court in *Basurto* did not rely on the supervisory powers of the court.  Rather, the court in *Basurto* found a violation of the Due Process Clause, at least in part, because the grand jury relies on the prosecutor to initiate, prepare and investigate cases and prepare indictments for the grand jury's consideration. *Basurto*, 497 F.2d at 785.

The court in *Basurto* did not rely on its supervisory power to reverse the conviction and dismiss the indictment.  Valdez relies on this court's supervisory powers in arguing that his indictment should be dismissed.  Accordingly, *Basurto* does not support the legal position asserted by Valdez.

Furthermore, the court in *Basurto* did not conduct a prejudice-harmless error analysis, as is clearly required by *Bank of Nova Scotia*, whether the legal basis for the dismissal is under the court's supervisory powers or for a constitutional violation. Finally, the Ninth Circuit seems to be moving away from *Basurto*.  *See Isgro* and *Fernandez, supra*.

Valdez  recognizes the holding of *Bank of Nova Scotia*.  Valdez argues that actual prejudice is shown in this case because (1) prior to being released, he remained incarcerated over 43 months awaiting trial, during which time he lost property and was "unable to freely exercise his trade to earn income and meet his personal obligations", (2) since his pre-trial release, he has been subject to restriction on his liberty, including

**41**

electronic monitoring and "intensive pretrial supervision", (3) he has been forbidden to contact his mother (Sabina Luna Valdez), brother (Victor Luna Valdez) and sister (Maria Aide Delgado) because they are co-defendants in this case, and (4) he has suffered emotional distress as a result of his knowing the indictment "is based on a pattern of lies, dereliction of prosecutorial and investigative duties, and the utilization of false information" which allegedly impinge upon his right "to prepare his defense, fil[e] pretrial motions, and [receive] a fair trial."  Valdez argues that the use of false information and perjured testimony "will eventually lead to the utter failure of the judicial system to assure him a fair trial." [*See* rec. doc. 919, pg. 5-6].

The undersigned agrees with the government that Valdez' first three assertions of prejudice do not rise to the level requiring dismissal of the indictment.  Every defendant suffers some degree of prejudice following indictment, during pre-trial detainment and as a result of the ordinary restraints and burdens associated with pre-trial release. Thus, the undersigned cannot accept Valdez' argument, as every defendant could make this same showing of prejudice.  Clearly, the Supreme Court did not contemplate that such a minimal showing would suffice to warrant the extreme sanction of the complete dismissal of the indictment.  The prejudice which the courts look to is prejudice in the proceedings, not hardships associated with, or flowing from the proceedings, as asserted by Valdez here.

However, Valdez' fourth argument, that there has been a pattern of misconduct in this case which, separately, and in the aggregate, will preclude him from obtaining a fair trial, merits further inquiry, and, if proven, might indeed constitute the type of prejudice necessary for the dismissal of the indictment.[11]

After reviewing the entire record of these proceedings and the evidence presented at the hearing on this Motion, for the reasons set forth below, the undersigned concludes that dismissal of the indictment is not warranted in this case.

Valdez has failed to demonstrate that any error, separately, or in the aggregate, may have a "substantial influence" on the outcome of the proceedings or that it is "highly probable that any error [will have a] substantial and injurious effect or influence in determining the jury's verdict." *See Bank of Nova Scotia*, 487 U.S. at 256. Thus, Valdez has failed to show that he has, or will, suffer prejudice at the re-trial of this case which will preclude him from obtaining a fair trial. Furthermore, painstaking review of the

---

[11]In *Bank of Nova Scotia*, the Court noted that it was:

. . . not faced with a history of prosecutorial misconduct, spanning several cases, that is so systematic and pervasive as to raise a substantial and serious question about the fundamental fairness of the process which resulted in the indictment.

*Bank of Nova Scotia*, 487 U.S. at 259.

This language suggests that the Court has not foreclosed the possibility that a pattern of prosecutorial misconduct could be so entrenched and pervasive that it could justify dismissal of an indictment. This is not a case involving any longstanding and pervasive pattern of prosecutorial misconduct spanning several cases. To the contrary, the alleged misconduct is limited to this case. Moreover, the undersigned is aware of only a single other instance in which a complaint was made against AUSA Grayson, which he candidly admitted during his colloquy with the court on January 22, 2009. Nevertheless, in the absence of any controlling, definitive jurisprudence precluding dismissal of an indictment based on an alleged pattern of prosecutorial misconduct in a single case, the undersigned will address each of Valdez' claims.

record and evidence presented at the hearing on the Motion, as set out more fully below, does not support individual findings of prosecutorial misconduct, much less support a finding that an established pattern of prosecutorial misconduct in this case has been shown, that would justify the extraordinary sanction of the dismissal of Valdez' indictment.

Moreover, the errors alleged herein do not fall within the "very limited class of cases" which could be deemed structural errors, sufficient to exempt Valdez from demonstrating prejudice.

## I.  Perjury Before the Grand Jury/Factual Inaccuracies in the Record

Valdez argues that his Fifth Amendment right to Due Process was violated when Agent Catalan committed perjury before the grand jury, and AUSA Grayson committed subornation of perjury and prosecutorial misconduct before the grand jury.  More specifically, Valdez argues that Agent Catalan testified falsely about information which was incorporated into the overt acts contained in the original, first and second superceding indictments, and that AUSA Grayson either knew the testimony was false and/or failed to timely correct the inaccuracies.  These contentions are addressed below.

Initially, the undersigned notes that the second superceding indictment was returned by a different grand jury than that which heard the evidence resulting in the return of the original and first superceding indictments.  Moreover, the evidence which

resulted in the return of the second superceding indictment was not presented by AUSA Grayson, but rather was presented by another Assistant United States Attorney, John Luke Walker.  Finally, the court's review of the September 14, 2011 transcript of the grand jury proceedings (those proceedings which resulted in the return of the second superceding indictment) reveals that there is nothing in the presentation to the grand jury which appears in any way improper or factually inaccurate. [rec. doc. 958].

To the extent that Valdez argues that the evidence presented to the grand jury with respect to the original and first superceding indictments was tainted or inaccurate, it is clear that these alleged defects and/or improprieties have been cured by the presentation of untainted, factually accurate evidence to a different, impartial and unbiased grand jury, exercising its own independent judgment. Courts have held that re-indictment can cure a defect in an indictment which requires dismissal.  *See United States v. Slough*, 679 F. Supp.2d 55, 58-59 (D. D.C. 2010) (and cases cited therein, including cases by analogy involving *Kastigar* violations).

Furthermore, in a factually similar situation, where misconduct occurred before one grand jury, in remanding the case for further proceedings, the Third Circuit suggested that if the misconduct is confined to the first grand jury "and none of it affected the second, the defendants had the benefit of consideration of the charge by a panel unaffected by [the prosecutor's] effort to create bias or prejudice.  The presence of an independent grand jury would satisfy our concerns to preserve both the fact and the

45

appearance of fairness in grand jury proceedings.  No more would be required to sustain the indictment." *United States v. Serubo,* 604 F.2d 807, 818 (3rd Cir. 1979).[12]  Thus, the court concluded that "[i]f the second grand jury was insulated from the effects of [the prosecutor's] misconduct, and no similar misconduct occurred in his presentation to it, the motion to dismiss may properly be denied." *Id.* at 819.

That is the case herein.  The complained of defects in the original and first superceding indictments have been cured by re-indictment by a different grand jury.  Indeed, this fact formed the basis for this court's ruling dismissing Valdez' original Motion to Dismiss, seeking dismissal of both the original and first superceding indictments returned in this case. [rec. docs. 952 and 973].

Nevertheless, to the extent that Valdez argues that these alleged inaccuracies and improprieties constitute a pattern of misconduct warranting dismissal of the pending second superceding indictment, each of Valdez' complaints will be examined.

For the reasons set out below, the undersigned finds that since the return of the second superceding indictment, any possible prejudice resulting from the alleged pattern of actions or inactions has now been cured, thus, providing no basis for dismissal of the indictment with prejudice.  Stated differently, given the return of the second superceding

---

[12]While *Serubo* pre-dates *Hasting* and *Bank of Nova Scotia,* and its holding as to the use of the court's supervisory power to dismiss an indictment in the absence of actual prejudice has therefore been overruled, the court's analysis as it relates to the second grand jury being free from taint, and therefore preserving both the fact and appearance of fairness in the grand jury process, remains sound.

indictment, the court cannot find that the "the violation[s] substantially influenced the grand jury's decision to indict" or that "there is 'grave doubt' that the decision to indict was free from substantial influence of such violations." *Bank of Nova Scotia,* 487 U.S. at 256.  Accordingly, exercise of this court's supervisory powers to dismiss the second superceding indictment is not warranted.

## A.  Overt Acts

## Overt Act (a)

In the original and first superceding indictments, Valdez is alleged to have possessed marijuana and cocaine in Arkansas on February 11, 2003.  The Arkansas Highway Police Incident Report reveals that the arresting officer stopped a tractor-trailer owned by Valdez, and  in which he was a passenger.  Upon search of the sleeper berth, the officer found what appeared to be bundles of marijuana wrapped in beige colored tape and "50 small individually wrapped pieces of a hard white material."  Field tests of these substances were positive for marijuana and cocaine, respectively. [D 3].

On November 14, 2006, AUSA Grayson questioned Agent Catalan before the grand jury as follows:

> Mr. Grayson: There was also some hard substances found that they thought was cocaine?
> Agent Catalan: Correct.
> Mr. Grayson: Have we gotten any lab report yet?
> Agent Catalan: Not yet.

[D 5, pg. 7-8].

At the evidentiary hearing, Agent Catalan testified that at the time of his grand jury testimony, he had only the Arkansas Highway Police Incident Report indicating that the hard white substance found by the arresting officer field tested positive for cocaine. Accordingly, his answers to AUSA Grayson's questions were truthful. The officer did seize something he believed to be cocaine and the government did not have a lab report verifying that belief.

Sometime prior to the January 2009 trial, the government received a Report of Laboratory Analysis from the Arkansas State Crime Laboratory dated May 19, 2003, which indicates that the hard white substance was not a controlled substance. [D 3]. Agent Catalan testified that he received the lab report from the United States Attorney's Office in 2008; AUSA Grayson testified that the report was received after the original and first superceding indictments had been obtained and before the January 2009 trial. Neither Agent Catalan nor AUSA Grayson could explain why the laboratory report was not obtained at an earlier date. However, Agent Catalan acknowledged that he and the United States Attorney's Office shared responsibility to obtain the document.

When the case went to trial in January 2009, the indictment had not been amended to reflect that Valdez possessed only marijuana, and not cocaine. AUSA Grayson testified that the indictment had not been amended due to oversight, and that he did not realize that the allegations contained in overt act (a) of the indictment were incorrect until

Mr. Richard filed his original Motion to Dismiss.  However, a stipulation had been

prepared and signed by AUSA Grayson, and defense counsel, including Valdez' former

counsel, Jack Lamar Wolfe, stipulating that if the Arkansas State Crime Laboratory

chemist would testify at trial, he would testify that one of the substances received from

the February 13, 2003 stop was marijuana, and the other substance did not contain

controlled substances. [D 3].  The stipulation was not filed in the record, perhaps because

the case was mistried on the third day of trial.

The record reflects that Mr. Richard was appointed to represent Valdez in August,

2009. [rec. doc. 618].  On questioning by the court, Mr. Richard acknowledged that he

received discovery, including the lab report, when he was appointed to represent Valdez.

The record further reflects that during a pre-trial conference before Judge Doherty on

June 30, 2010, the parties confirmed that they had entered into a stipulation regarding the

testimony of the forensic chemist, which was to be entered into evidence during the

government's case in chief and provided to the court at counsel's earliest convenience.

[rec. doc. 784].

Valdez' original motion to dismiss raising the inaccurate reference to cocaine in

overt act (a) was filed on May 23, 2011.  [rec. doc. 829].  Thereafter, on July 5, 2011, the

government filed a Motion to Amend the indictment to delete the words "and cocaine" in

overt act (a). [rec. doc. 840].  Valdez opposed the Motion, arguing that the government

should be required to present the correct information to a new grand jury for independent

consideration. [rec. doc. 846].  The government's Motion to Amend was denied [rec. doc. 873] and, thereafter, the government obtained the second superceding indictment from the different grand jury, wherein overt act (a) correctly alleged that Valdez possessed only marijuana during the February 11, 2003 Arkansas traffic stop. [rec. doc. 911].

Given the evidence presented, it is clear that Agent Catalan did not commit perjury before the grand jury on November 14, 2006.  It is equally clear that AUSA Grayson did not suborn the alleged perjury.  However, the government was clearly dilatory in obtaining the Arkansas State Crime Laboratory Report.   That Report was issued in May 2003, yet was not received by the government until 2008.  Nevertheless, on the evidence presented, the undersigned cannot conclude that this failure caused Valdez any prejudice. Valdez has now been indicted by an independent grand jury which was presented accurate information about the substances which were obtained during the February 11, 2003 traffic stop, and the indictment correctly alleges the facts upon which Valdez will be tried. [*See* rec. doc. 958, pgs. 30-33].  Moreover, the lab report was provided to counsel for Valdez before the trial commenced.  Clearly, there was no attempt to introduce inaccurate facts before the trial jury.

Moreover, while the government's handling of this matter cannot be commended, under the circumstances, the government's actions cannot be found entirely unreasonable. At the time the original and first superceding indictments were obtained, the government was relying on the field test results contained in the arresting officer's report.  As

admitted by defense counsel during questioning by the court, this case involved over 20,000 pages of documents.  Under the circumstances, the fact that the government failed to obtain the additional laboratory report confirming the results of the field testing until just prior to the 2009 trial was an understandable oversight.

For these reasons, dismissal of the second superceding indictment based on this inaccuracy contained in the original and first superceding indictments is not warranted.

**Overt Act (b) (formerly (d)) and Overt Act (c) (formerly (f))**

Overt Acts (b) and (c) (formerly (d) and (f)) allege that on April 27, 2004 and May 21, 2004, respectively, Valdez, Victor Luna Valdez and Sabina Luna Valdez visited the residence of Alexander.  Valdez complains that in response to questioning by AUSA Grayson before the November 14, 2006 grand jury, Agent Catalan failed to mention that on each occasion there was an additional passenger in the vehicle in which the trio were traveling, an unidentified Hispanic female and Felipe Aranda, respectively, thus rendering Agent Catalan's testimony false.  Valdez further argues that this information was intentionally omitted by Agent Catalan to establish a pattern to connect the defendant's family members to illicit drug activity.

With respect to the April 27, 2004 incident, the challenged testimony is as follows:

Mr. Grayson: Now, on overt Act "D."
Agent Catalan: April 27, 2004: We were conducting surveillance at Eric Alexander's newly occupied home at 109 Essen Drive.  And we spotted a Ford Excursion with Texas tags pulling out of his garage.
Mr. Grayson: And thereafter did you follow this vehicle?

51

Agent Catalan: Yes, we did.

Mr. Grayson: And at some point , did you ask some agency to assist you in affecting a traffic stop?

Agent Catalan: Yes, we asked the Louisiana State Police.

Mr. Grayson: And it was stopped in Jefferson Parish?

Agent Catalan: Yes.

Mr. Grayson: And who was in the vehicle?

Agent Catalan: Victor Valdez, Antonio Valdez and Sabina Valdez.

Mr. Grayson: But nothing incriminating was found in the vehicle?

Agent Catalan: No.

[D 5, pg. 9-10].

With respect to May 21, 2004 incident, the challenged testimony is as follows:

Mr. Grayson: Now, on overt Act "F."

Agent Catalan: May 21, 2004: During surveillance, we observed another black Ford Excursion pulling out of Eric Alexander's residence. It turned out to be the same Ford Excursion. And we requested another vehicle traffic stop, by the Sulphur Police Department this time

Consent was given by the driver, Victor Valdez, but nothing was found except a roll of Saran Wrap.  And the passengers were Antonio Valdez, Jr. and Sabina Valdez.

- - BRIEF INTERRUPTION- -

Mr. Grayson: And so who - - what did we just talk about?

Agent Catalan: May 21st, 2004, the traffic stop.  The Ford Excursion with Victor Valdez, Antonio Valdez and Sabina Valdez.

Mr. Grayson: And the Saran Wrap.

Agent Catalan: Correct.

[D 5, pg. 11].

Agent Catalan testified that he probably did not mention the unidentified Hispanic female in the first incident because she was not identified.  Moreover, he testified that his testimony was not in error because he was not asked how many passengers were in the

vehicle.  Rather, he was asked only who the passengers were and he could not identify the fourth passenger.

Furthermore, to date, Agent Catalan testified that he has no idea of the identity of the female passenger, and has no reason to suspect the unidentified female had anything whatsoever to do with this case.  Likewise, Agent Catalan testified that he did not mention that Felipe Aranda was a passenger in the vehicle stopped on May 21, 2004 because, to his knowledge, Aranda has nothing to do with this case.  Accordingly, he was not trying to conceal any relevant information from the grand jury.

AUSA Grayson testified that Agent Catalan's testimony was correct because Agent Catalan identified three people who were occupants in the vehicles.  However, AUSA Grayson acknowledged that the testimony was incomplete because a fourth occupant was not mentioned in either incident.  AUSA Grayson testified that the fact that there was some unidentified Hispanic female also in the vehicle was of very little moment.  Moreover, AUSA Grayson could not state whether he knew Agent Catalan's testimony regarding the occupants of the vehicle stopped on May 21, 2004 was incomplete when given, because he might not have recalled that there was an additional person present.

In light of the grand jury transcript cited above and the testimony of Agent Catalan and AUSA Grayson, it is clear that Agent Catalan's testimony was not false.  Agent Catalan did not falsely assert that the three members of the Valdez family were the *only*

occupants of the vehicles, and Agent Catalan's testimony that all three were occupants of the vehicles is accurate. It therefore follows that AUSA Grayson did not suborn Agent Catalan to commit perjury.  Furthermore, there is no evidence before this court to implicate either the unidentified Hispanic female or Felipe Aranda in the charged conspiracy, or to support a finding that their presence in the vehicle on a single occasion has any relevance whatsoever to the pending charge. Indeed, neither is listed as an un-indicted co-conspirator. [*See* rec. doc. 208].

Valdez argues that the presence of the fourth individual in each car was intentionally not disclosed to the grand jury to establish a pattern to connect the Valdez family members to illicit drug activity.  Presumably, the government's disclosure of the presence of a fourth individual in the stopped vehicles would defeat this purpose.  The court declines to draw that conclusion as it strains the court's credulity.

Furthermore, the law does not require the government to present all relevant evidence, or even exculpatory evidence, to the grand jury before seeking an indictment. To the contrary, because the grand jury sits not to determine guilt or innocence, but to assess whether there is adequate basis for bringing a criminal charge, the Supreme Court has held that the grand jury need only be presented with "the prosecutor's side", without requiring the prosecutor to present exculpatory evidence in his possession.  *United States v. Williams*, 504 U.S. 36, 51-52. 112 S.Ct. 1735 (1992).  Stated differently, "it is the grand jury's function not 'to enquire . . . upon what foundation [the charge may be]

denied,' or otherwise to try the suspect's defenses, but only to examine 'upon what foundation [the charge] is made' by the prosecutor." *Id.* (internal citations omitted)

Additionally, since Valdez was provided with the Reports of Interviews ("ROIs") of each stop which disclosed the presence of the unidentified Hispanic female and Felipe Aranda in the stopped vehicles,  the undersigned cannot find that their presence was purposefully hidden from the defense. [*See* D 6 and D4].

Finally, to the extent that Valdez criticizes the government for failing to include the names of the unidentified Hispanic female and Felipe Aranda in any of the indictments returned in this case or in the factual stipulations supporting the pleas of Victor Valdez and Sabina Luna Valdez, the court is unaware of any requirement that the presence or identity of an individual who the government cannot prove was involved in the criminal activity be named in the indictments.  To the contrary, such information would constitute mere surplusage.

For these reasons, dismissal of the second superceding indictment, based on the failure to disclose to the grand jury or identify all passengers in the vehicles which visited the residence of Alexander on April 27, 2004 and May 21, 2004, which are the subject of Overt Acts (b) and (c), respectively, is not warranted.

**Overt Acts (l) and (m) (formerly (p) and (q))**

Valdez argues that overt acts (l) and (m) of the second superceding indictment are improper in that they charge that inanimate objects, tractor-trailer trucks titled in the name

of Valdez, are alleged to have committed overt acts.

Overt act (l) states that "[o]n or about April 23, 2006, a 1999 Kenworth tractor truck titled to Antonio Luna Valdez, Jr., and pulling a trailer southbound was stopped near the Border Patrol Checkpoint at Sarita, Texas.  In the trailer was found $961,155 U.S. currency."

Overt act (m) states that "[o]n or about May 20, 2006, a 1991 Kenworth tractor truck titled to Antonio Luna Valdez, Jr., and pulling a trailer was stopped on La Joya, Texas.  In a secret compartment in the trailer was found approximately 335 kilograms of marijuana."

While perhaps not expressly stated, it is clear from a reading of the language of these overt acts, and the indictment as a whole, that the government is alleging, not that the trucks engaged in illegal conduct, but, rather, that the use of Valdez' vehicles in drug trafficking activities evidences Valdez' knowing participation in the charged drug conspiracy.  The government should be free at trial to present whatever evidence it may have to show this connection at trial.  Furthermore, even if these overt acts were improperly included in the indictment, Valdez has cited no jurisprudence permitting dismissal of an indictment under this court's supervisory powers for inclusion of an allegedly invalid overt act.

**Overt Act (d) (formerly (j))**

In all three indictments returned in this case, Overt Act (d) (formerly (j)) alleges that on November 26, 2004, Valdez was a passenger in a vehicle with Victor Luna Valdez and Sabina Luna Valdez, which was entering the United States from Mexico, wherein Sabina Luna Valdez was found to have been carrying on her person six kilograms of cocaine and three grams of cocaine base.  Valdez argues that while the indictments do not contain factual errors, during Agent Catalan's testimony before the grand jury on November 14, 2006, Agent Catalan testified falsely, stating that in addition to drugs, a large sum of money was found in the vehicle, which Agent Catalan incorrectly testified was as a black Ford 2004 Excursion.  The challenged excerpt is as follows:

> Mr. Grayson: All right. Overt Act J.
> Catalan: It's November 26, 2004: a black Ford Excursion was stopped at the Progresso, Texas point of entry.  The occupants were Sabina Luna Valdez, Antonio Valdez, Jr. and Victor Valdez.  And on Sabina Valdez, they found 5.9 kilograms of cocaine.
> . . .
> Mr. Grayson: They also found some money?
> Catalan: Fifteen thousand six hundred twenty five dollars.

[D 5, pg. 15].

It is undisputed that there was no cash seized during this stop.  It is further undisputed that the vehicle was incorrectly identified as a 2004 model, instead of a 2000 model.  Valdez suggests that there is additionally a question as to the correct color of the

57

vehicle.  However, the evidence does not definitively demonstrate the color of the vehicle involved in the November 26, 2004 stop.[13]

Both AUSA Grayson and Agent Catalan explained how this misinformation was presented to the grand jury.  Agent Catalan testified that he had reviewed the SEACATS report of the stop, which is an incident report used by agents to document seizures.  That report indicates that the value of the vehicle stopped and seized, a 2000 Ford Excursion, was $15,625.00. [D 20]. Agent Catalan testified that AUSA Grayson had prepared a prosecutive memorandum, which he, Agent Catalan, used as notes when testifying before the grand jury.

The memorandum incorrectly stated that cash was seized along with drugs.  The amount of cash which the memorandum incorrectly stated had been seized was the value of the vehicle.  Agent Catalan merely read this information to the grand jury.  Agent Catalan testified that the memorandum also probably contained a typographical error as to the model year of the stopped vehicle.  Agent Catalan therefore likely got the incorrect information as to the model year of the stopped vehicle from the memorandum as well.

---

[13]The SEACATS Report identifies the vehicle as a 2000 Ford Excursion bearing Texas license plate number 4CWW60, but does not indicate a color of the vehicle. [D 20].  The factual stipulations of Victor Luna Valdez and Sabina Luna Valdez  indicate the vehicle was a black 2000 Ford Excursion. [D 42 and D 44].  The undersigned notes that at least three different Ford Excursions were involved in this investigation, bearing Texas license plate numbers K28FCX (the April 27, 2004 and May 21, 2004 stops), 4CWW60 (the November 26, 2004 stop) and MAIDE (a June 9, 2005 stop); the former two vehicles were apparently black, while the latter was apparently green. [*See* D 6, D 4, D 20, and D 40].

AUSA Grayson likewise testified that he prepared a "prosecutive memorandum" which he used to question Agent Catalan before the grand jury, and Agent Catalan used as a guide for his responses. AUSA Grayson further testified that he probably made the transcription mistakes in the memorandum by erroneously reading or interpreting the SEACATS report because he was not familiar with SEACATS reports. AUSA Grayson also testified that with respect to the original and first superceding indictments, he did not knowingly present to the grand jury any information that he knew to be false.

Given the above testimony, it is clear that the errors contained in the memorandum on which Agent Catalan relied when testifying before the grand jury, resulted from a simple misreading of the SEACATS report by AUSA Grayson. It is clear that Agent Catalan was not attempting to intentionally mislead the grand jury. Furthermore, as Agent Catalan noted, there is no mention in any indictment returned in this case of any amount of cash seized during this stop, nor is there any mention of the model, color or year of the vehicle stopped. Perhaps Agent Catalan should have recognized the errors in the memorandum he used when testifying before the grand jury, but his failure in doing so falls far short of perjury. AUSA Grayson, who prepared the memorandum which contained the incorrect information, is apparently not familiar with these reports, and the court concludes that the errors contained in the memorandum prepared by AUSA Grayson were the result of simple mistake.

While Valdez argues that this testimony was intentionally presented to the grand jury to associate him with other overt acts ((d) and (f) of the original and first superceding indictments, renumbered as (b) and (c) of the second superceding indictment) involving a black 2002 model Ford Excursion occupied by Valdez, Victor Luna Valdez and Sabina Luna Valdez, there is no evidence that the errors contained in the memorandum were knowingly or intentionally placed therein with the intent to present knowingly false testimony to the grand jury.  The evidence shows the opposite.[14]  Both Agent Catalan and AUSA Grayson credibly testified that they did not knowingly or intentionally present false testimony to the grand jury.  There is no evidence to the contrary.

Furthermore, even if this court were to find Agent Catalan's explanation not credible, and further find that his testimony was perjured, dismissal of the indictment under the court's supervisory powers is not an appropriate remedy.  After extensively analyzing the pertinent Supreme Court decisions, the Fifth Circuit has limited the remedy of dismissal of the indictment to misconduct by prosecutors. *United States v. Strouse*, 286 F.3d 767, 774-776 (5th Cir. 2002).

In *Strouse*, the Fifth Circuit held that perjury before the grand jury that was not knowingly sponsored by the government may not form the basis for dismissal of the indictment (even dismissal without prejudice) under the limited supervisory power of the district court.  *Strouse*, 286 F.3d at 768.  The Court reached that conclusion after carefully

---

[14] *See* fn. 13, *supra.*

analyzing the Supreme Court's decisions in *Mechanik*, *Bank of Nova Scotia,* and *Williams*.  *Id.* at 772-774.

However, Valdez argues that Agent Catalan is *part of* the government, particularly in this case where he served as the case agent and presented the government's evidence to the grand jury.  A careful reading of *Strouse* precludes that argument.

In *Strouse*, the Fifth Circuit noted that in *Bank of Nova Scotia*, the Supreme Court refused to affirm a dismissal of an indictment which rested in part, *on the factual finding* that "IRS agents gave misleading and inaccurate summaries to the grand jury just prior to indictment."  *Id*. at 774.  *Strouse* then quoted the Supreme Court's decision in *Bank of Nova Scotia* as follows: "Because the record does not reveal any *prosecutorial* misconduct with respect to these summaries, they provide no ground for dismissing the indictment."  *Id*. at 774 *quoting Bank of Nova Scotia*, 487 U.S. at 260 (emphasis added). *See also* Justice O'Connor's concurring opinion in *United States v. Mechanik*, 475 U.S. at 74, 106 S.Ct. 938 (O'Connor, J., concurring in the judgment) (prosecutors are bound by a few, clear rules to ensure the integrity of the grand jury's function).

Because of the strict reliance by the Court in *Strouse* on the discussion of the Supreme Court in *Bank of Nova Scotia* in which, as a matter of *fact*, government agents presented misleading and inaccurate summaries to the grand jury, this court concludes

that perjury by a government agent before the grand jury does not warrant dismissal of the

indictment unless the government prosecutor knew of the perjury and did not correct it.[15]

This court's reading of *Strouse* is supported by decisions of other courts, both

within and outside of this Circuit. *See United States v. Aldridge*, 2011 WL 1811074, *5

(S.D. Tex. 2011) (Lake, J.) ("Even if [special agent] McCallum did testify falsely before

the grand jury, Aldridge has not cited any evidence showing that AUSA Lowery knew

that [special agent] McCallum testified falsely before the grand jury, and absent such

evidence the court has no basis on which to dismiss the indictment."); *United States v.*

*Cisneros*, 456 F. Supp.2d 826, 868 (S.D. Tex. 2006) (even if the defendant had shown

that FBI Special Agent Church perjured himself before the grand jury, the defendant

failed to show that the "government" had knowledge of it); *United States v. Forte*, 65

Fed. Appx. 508, 2003 WL 1922910, *6 (5th Cir. 2003) (assumes without deciding that

even if a DEA agent committed perjury before the grand jury, dismissal is warranted only

if the perjurious testimony is sponsored by the "government"); *United States v.*

*Funderbunk*, 492 F. Supp.2d 223, 259 (W.D. N.Y. 2007) (standing alone, misleading

testimony by a federal agent before a federal grand jury does not warrant dismissal as a

sanction – relying on *Bank of Nova Scotia* and *Strouse*); *United States v. Lopez*, 426 Fed.

---

[15]The *Bank of Nova Scotia* Court explained the error of the lower court's ruling noting that the record evidence did not support the lower court's "finding that the prosecutors knew the evidence to be false or misleading, or that the Government caused the agents to testify falsely . . . [a]lthough the Government may have had doubts about the accuracy of certain aspects of the summaries, this is quite different from having knowledge of falsity." *Bank of Nova Scotia,* 487 U.S. at 261.

Appx. 260, 263-264 (5th Cir. 2011) (defendant failed to show that the "government" knew

that any of the cited testimony by FBI Agent Payne was false).[16]

All of these cases support the conclusion reached by this court: perjury by a federal

agent before a federal grand jury does not warrant dismissal unless the prosecutor knew

the testimony was false and sponsored, condoned or, at the very least, failed to correct it.

While Valdez argues that Agent Catalan's alleged knowledge of falsity should be

imputed to AUSA Grayson, that argument cannot be accepted in light of the above cited

controlling Fifth Circuit and Supreme Court jurisprudence.  This jurisprudence does not

permit dismissal under the supervisory powers based on misconduct of the "prosecutorial

team" which includes government agents and investigators, but, rather, solely on the

misconduct of the prosecutor.

The evidence before this court does not support a finding that AUSA Grayson

knew that Agent Catalan's testimony before the grand jury was false.  Absent such

evidence, this court has no basis to dismiss the original and first superceding indictments,

much less the second superceding indictment which, again, was returned by a new grand

jury. *Strouse, Aldridge, Cisneros, supra*.

Moreover, Valdez has failed to demonstrate that he suffered any prejudice as a

result of the challenged inaccuracies.  The original grand jury heard evidence of many

---

[16]The court recognizes that unpublished opinions of the Fifth Circuit have no precedential effect, and this court does not feel bound to follow any unpublished opinion.  *See* Fifth Circuit Rules 28.7 and 47.5.4.

other acts implicating Valdez in the charged conspiracy.  For example, Valdez was a

passenger in the car in which Sabina Luna Valdez was carrying six kilograms of cocaine

and three grams of cocaine base and was the titled owner of two tractor-trailer trucks in

which nearly a million dollars in cash and a large quantity of marijuana were discovered.

Thus, even without Agent Catalan's allegedly false testimony, any rational grand jury

could have charged Valdez with the crime for which he awaits trial.  In fact, that is

exactly what happened after the presentation to the new grand jury before which none of

these "errors" were repeated.

The court is therefore not persuaded that Agent Catalan's allegedly false grand

jury testimony either influenced the grand jury's decision to indict Valdez or forced

Valdez to defend a charge absent reasonable cause to believe him guilty. *See Aldridge*,

2011 WL 1811074 at *5 *citing United States v. Robinson*, 367 F.3d 278, 288 (5th Cir.),

*cert. denied*, 543 U.S. 1005, 125 S.Ct. 623, 160 L.Ed.2d 466 (2004) ("[O]ur inquiry

focuses solely on the question whether, on the basis of the evidence that would have been

available to the grand jury, any rational grand jury presented with a proper indictment

would have charged [the defendant with] the offense in question.").

Stated differently, even if the original and first superceding indictments had been

tainted by the presentation of incorrect information, the second superceding indictment by

the new grand jury, is not so tainted. Thus, it is abundantly clear that Valdez cannot

demonstrate that he has, or will, suffer any prejudice.

For these reasons, dismissal of the second superceding indictment based on the

inaccuracies in Agent Catalan's November 14, 2006 grand jury testimony regarding the

November 26, 2004 stop is not warranted.

## B. Inaccuracy in Factual Stipulations

Valdez additionally complains that AUSA Grayson deliberately introduced this

same false information into the record by incorporating these incorrect facts into the

Stipulated Factual Basis for the guilty pleas of co-defendants Victor Luna Valdez and

Sabina Luna Valdez. [D 42 and D 44].

As previously noted, AUSA Grayson testified that he prepared a "prosecutive

memorandum" which contained the complained of inaccuracies.  AUSA Grayson further

testified that he used this same memorandum to prepare the stipulated factual basis for the

pleas of Valdez' co-defendants, "cutting and pasting" the incorrect prose into the plea

documents.  Accordingly, these errors were "compounded" or repeated throughout the

litigation as they were not brought to Grayson's attention by the defendants, their counsel

or the agents.

AUSA Grayson explained that these documents set forth the information that the

government has relating to the crime to factually support the defendant's guilty plea.  The

documents are not entered for any other purpose and they are not intended to limit the

government's evidence at the trial of any co-defendant.  AUSA Grayson testified that if a

defendant does not agree to the information in the proposed factual basis, he may object,

he may say that he cannot verify the information, or, if the factual basis is sufficient without the disputed information, it may be deleted.

AUSA Grayson testified that he did not know why the year of the Ford Excursion, which was stated to have been a 2004 model before the grand jury, was subsequently changed in the factual stipulations to reflect the correct year model, 2000, in the factual stipulations.  AUSA Grayson speculated that perhaps Agent Catalan saw the error of the year and he, AUSA Grayson, changed it, or perhaps he, AUSA Grayson, looked at the report more carefully.  Indeed, based on AUSA Grayson's testimony it is at least possible that one of the defendants or one of the defense attorneys brought the correct model year to AUSA Grayson's attention.   The court finds the testimony of AUSA Grayson credible on this issue.  The court, like AUSA Grayson, cannot find any nefarious reason for the change. Under the facts of this case, the model year of the vehicle is without significance.

While Valdez argues that the incorrect information in the factual basis for the pleas will limit his ability to present his defense and prejudice his right to call, confront and cross-examine these witnesses because they may be subject to perjury charges if they do not testify in accordance with what is stated in the factual basis for their pleas, that argument is unconvincing.

Valdez may call, confront and cross-examine any witness at the upcoming trial. Furthermore, contrary to Valdez' argument, Valdez will benefit from having the opportunity to impeach the credibility of the witness based on the witness' prior incorrect

affirmation, whether the witness testifies in accordance with, or in contravention of, the information contained in the factual basis for their plea.  Finally, it is not even remotely possible that the government would ever pursue perjury charges against any co-defendant for testifying in accordance with information that AUSA Grayson admits was incorrect.

## C. Un-Recorded Interviews

In connection with his argument regarding the factual basis to support co-defendants' guilty pleas, Valdez also suggests that this court exercise its supervisory powers to dismiss his indictment on grounds of the alleged inadequacy of the manner in which interviews of various witnesses are recorded by government agents.[17]  Agent Catalan testified that ROIs are generated at his discretion, based on handwritten notes he has taken during an interview, or his memory of the interview when no notes have been taken, and that while recording the interview might be more accurate, it is not common practice for agents to record the interviews.

Agent Lance Lopez ("Agent Lopez") also testified that he generates ROIs based on his memory and notes of formal interviews, and that he does not record interviews. Agent Ferro testified similarly, stating that he generates an ROI when he deems it appropriate, and such reports are generated from notes and memory, even though a taped

---

[17]In his Motion to Dismiss, Valdez argues that "these cooperating defendants are faced with making statements to federal agents, wherein it is against the agencies' policy to record or take verbatim notes or allow the cooperating defendant to adopt the Report of Investigation that is sometimes drafted at a much later date from some very broad notes.  Notes are subject to the liberty of the agent writers pen with a need to complete his/her investigation. The cooperating defendant can then be charged with making false statements to government agents."

recording would be more accurate.  There is thus, apparently, no policy or procedure as to when or how an ROI is to be produced.  In Valdez' opinion, this lends itself to errors and omissions in the information received, as well as the promulgation of inaccurate information, and additionally serves as a basis for later charging a cooperating defendant with perjury.

While the undersigned agrees that the procedure employed by the Agents to memorialize interviews may not be the best or most accurate method available, this court is without power to exercise "a 'chancellor's foot' veto over law enforcement practices of which [this court] does not approve."  *See United States v. Russell*, 411 U.S. 423, 435, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973); *Hampton v. United States*, 425 U.S. 484, 490, 96 S.Ct. 1646, 1650, 48 L.Ed.2d 113 (1976) (plurality opinion). To the contrary, "[t]he execution of the federal laws under our Constitution is confided primarily to the Executive Branch of the Government, subject to applicable constitutional and statutory limitations and to judicially fashioned rules to enforce those limitations." *Id*.

For this reason, the undersigned finds no basis to dismiss the indictment on these allegations.

**D. Withholding and Destruction of Evidence**

Valdez complains that he was not provided the June 9, 2005 video statement of co-defendant Ana Montoya ("Montoya") until defense counsel filed a motion for supplemental discovery on July 20, 2011.  Valdez alleges that the video statement is

exculpatory because "upon watching the video, she [Montoya] states that the cocaine seized in Overt Act j was for Victor Valdez."

In response to the Supplemental Discovery Motion, the government asserted that the video was not provided for the following reasons: (1) because the statement was made in connection with a traffic stop at which Valdez was not present; (2) all three co-defendants involved in the stop (Victor Luna Valdez, Montoya and Maria Aide Delgado) had already pled guilty and, hence, Montoya's video statement was not a part of the government's evidence which would be sought to be introduced at Valdez' trial; (3) Montoya was not going to be called as a witness at trial and the video was therefore neither Jencks Act material, nor impeachment material under *Giglio*; and (4) that the statement contained nothing exculpatory as to Valdez to constitute *Brady* material. [rec. doc. 858, adopting AUSA Grayson's email filed as an exhibit to rec. doc. 854-1, at pg. 2-3].

At the evidentiary hearing, Agent Catalan testified that he had reviewed Montoya's video statement. She, Montoya, said that she was at a party for Victor Valdez's wife and that Victor was drunk.  He, Victor, made statements about the November 2004 border stop, telling Montoya that he and his brother were present, that drugs were found on his mother, and that she was arrested.  Montoya did not discuss who the drugs belonged to and she did not state that the drug was cocaine, only that there were drugs found.  While Montoya said Victor "splurged", Agent Catalan understood that to mean that he, Victor

Valdez, divulged information about the stop.  When Montoya mentioned to Maria Aide Delgado what Victor had told her, Delgado got upset because the incident was personal and Victor should not have been talking about it.

Agent Ferro, who was present at the Montoya interview, recalled, apparently incorrectly, that Montoya related that when Victor Valdez found out that Montoya knew about his mother's arrest, Victor got angry because he was intoxicated.  Ferro's notes, however, do not indicate that Victor mentioned that the drugs were for him.

AUSA Grayson testified that the government had not provided a copy of Montoya's video taped statement, but the Report which discloses the existence of the statement was produced.  AUSA Grayson testified that he did not believe Valdez was entitled to discover the tape because the tape was not Valdez' statement, the people that were involved in that particular incident had pled guilty and that the tape would not have been played at trial.

With respect to the contents of the statement, AUSA Grayson testified that Victor Valdez told Montoya about the stop, but that, other than the fact that someone "got busted", there was nothing said about the drugs.  Montoya also said that when Maria Aide Delgado found out, Delgado got mad. It was his understanding that Victor was intoxicated at the party when he made the statements to Montoya about the stop, but did not remember the word "splurged."

The undersigned has reviewed the video statement entered into evidence as D 7, and agrees with the characterization of the statement by Agent Catalan.  At the end of the statement (beginning at approximately 27:40) Montoya relates that she was at Victor Valdez' wife's birthday party when Victor, who was drunk, "splurged out" that his mother was in jail.  He, Victor Valdez, told Montoya that his mother, Sabina Luna Valdez, had been caught with drugs at the border and that "him and his brother were there", but that his "mother said it was hers."  When Montoya mentioned this to Maria Aide Delgado, Delgado got upset because that was "something personal."  Montoya did not know what type of drugs had been found.  She did, however, know that the incident occurred in November, 2004, and that the mother was out on bond and awaiting sentencing.

While the court understands the argument made by Valdez that the video tape was *Brady* evidence and therefore immediately discoverable, the court considers that argument a stretch.  While, at least conceivably, counsel might make some evidentiary use of the statement, the court is not convinced that it will provide the defendant very much help.  In any event, the video statement has now been given to counsel for Valdez.  Hence, it is available for use at Valdez' re-trial.  Thus, any prejudice that arguably existed as a result of this alleged discovery violation has been fully remedied.

Valdez also complains that the government has destroyed the video of the June 9, 2005 traffic stop involving Victor Luna Valdez, Montoya and Maria Aide Delgado.  The

71

evidence presented at the hearing demonstrates that the video was taken by the Louisiana State Police. [D 40].  Agent Catalan testified that pursuant to Louisiana State Police policy, the video was destroyed when the tape was five years old.  He had no role in the destruction of the video.

Although the Louisiana State Police Criminal Arrest Report (D 40) indicates by a checked box on the first page of the Report the existence of an Audio/Video Recording, Agent Catalan testified that he had not retrieved the tape of the traffic stop because he thought the Report was referencing the videotaped interview of Montoya.  He further testified that  he did not know of the existence of the tape until Valdez' supplemental discovery request. By the time Valdez requested the video, it had already been destroyed.

Agent Ferro also testified that he did not know the video existed.

AUSA Grayson testified that he had no distinct memory of the existence of the tape of the traffic stop until it was requested by supplemental discovery motion.  While the Louisiana State Police Report indicates the existence of a tape, AUSA Grayson testified that he was reviewing the Report for important information about the stop and seizure and may have overlooked the checked box indicating the existence of a videotape of the stop.

While the government should probably have recognized that a video tape of the traffic stop existed, and probably should have preserved the tape, there is nothing to suggest that this has caused Valdez any prejudice.  The court fails to see the relevance of

the traffic stop to the charge pending against Valdez.  He was not a participant in the June 9, 2005 incident, nor is there any evidence to suggest that he was in any manner involved in that incident.  The court cannot see any way that the video could possibly constitute *Brady* material as to Valdez.

Valdez also suggests that Montoya's video taped statement and tape of the stop are relevant because they demonstrates the falsity of Agent Catalan's testimony to the grand jury who returned the first superceding indictment on November 13, 2007, regarding the circumstances surrounding the discovery of the money recovered during the June 9, 2005 traffic stop.  More specifically, Valdez suggests that Agent Catalan testified falsely because the Louisiana State Police Report of the stop contains no mention of the fact  that Montoya was wearing spandex shorts, or that a female officer observed these shorts, and that these items of evidence could support his claim.

Contrary to these allegations, the transcript of Agent Catalan's grand jury testimony reveals that Agent Catalan was recounting what Montoya had told agents at the time of the stop. [*See* D 9, pg. 17].  Review of the video taped statement further confirms that Montoya indeed told agents Ferro and Killian that she was wearing spandex shorts and that a female officer saw the spandex shorts under Montoya's dress "because the dress blew – the wind blew and she saw it. . . ." [D 7, 22:00].

Furthermore, although Agent Catalan was not present during the stop, Agent Catalan testified at the hearing that Agent Ferro received this information from a female

Jennings police officer at the scene and relayed it to him.  Ferro, however, was not asked to confirm or refute Agent Catalan's testimony on this point.  Rather, Ferro's testimony confirmed only that a female officer had been called to the scene.  Finally, all three co-defendants present at the stop, including Montoya herself, confirmed in their factual stipulations supporting their pleas that Montoya was wearing spandex shorts under her dress. [D 41, D 42, D 43].  The record and evidence presented at the hearing therefore fails to substantiate Valdez' claim.[18]

For these reasons, Valdez is not entitled to any relief with regard to these allegations.

## II. Perjury and Fabrication of Testimony at the 2009 Trial

In the instant Motion, Valdez argues that prior to the January 2009 trial, the government possessed reliable information demonstrating that B & M was not located or operating at 1909 Jefferson Street in 1999.  Those documents include: (1) an Unofficial Detail Record of the Louisiana Secretary of State obtained during the execution of a search warrant at B & M in July 2006 indicating that B & M was incorporated on August 22, 2000 [D 29]; (2) a lease for the building located at 1909 Jefferson Street signed in March 2000 [G 2]; (3) a Louisiana Secretary of State Detailed Record obtained from the internet on November 7, 2006 [D 30]; (4) Agent Catalan's notes from an April 3, 2006

---

[18]Again, proving that Catalan lied to the grand jury which returned the superceding indictment avails Valdez naught unless he can also prove AUSA Grayson was aware of the lie. This Valdez cannot do for the reasons set out *infra.*

interview of Jennifer McKnight, which Valdez argues allegedly indicates that Neveu "started B & M in 2000" [D 37]; (5) information obtained during Neveu's May 28, 2008 debriefing, prior to entry of Neveu's June 12, 2008 guilty plea to conspiracy to commit money laundering and witness tampering, indicating that Neveu said that Alexander did not go to B & M until 2001-2002 and that is when he, Neveu, first learned that Alexander had been incarcerated in Texas [D 47]; and (6) emails of negotiations as to the verbiage to be contained in the factual basis supporting Neveu's guilty plea, indicating Neveu's disagreement with the statement that "he and Michael Wyatt were also aware that in 1999 Eric Alexander had been convicted of a drug offense in Houston, Texas, and was sentenced to a term of confinement in the Texas Department of Corrections", as Neveu told his attorney, Randal P. McCann, that he did not know why Alexander was in prison, that he did not know about Alexander's drug involvement until Alexander later loaned Neveu money for the business, and that Wyatt did not know until Wyatt learned of the loans [D 48 and 49].

The Motion then alleges that AUSA Grayson nevertheless called Alexander to testify to facts that he knew were false, namely, that Alexander had visited B & M in 1999 before going to jail in Texas on drug charges, and, in so doing, imputed knowledge to Wyatt that Alexander was a drug dealer.  These allegations were the subject of the motion made by Wyatt during the January 2009 trial, which Judge Doherty indicated did not rise to the level necessary for dismissal of the indictment against Wyatt.

75

Valdez further argues that while Judge Doherty was considering Wyatt's motion at trial, AUSA Grayson instructed Agent Catalan or the other agent on this case, Agent Lopez, to find evidence to corroborate Alexander's false testimony that B & M was operating in some capacity in 1999 at the 1909 Jefferson Street location.

Accordingly, during the court's recess, Valdez asserts that Agent Catalan deceived Deborah McKnight, who was present at the courthouse pursuant to a subpoena issued by the government, into believing that her daughter, Jennifer McKnight, had confirmed that the business was operating in 1999, despite the fact that she, Deborah McKnight, claims she told Agent Catalan that she did not know when B & M began operating.  AUSA Grayson allegedly then knowingly called Deborah McKnight to testify to these incorrect, fabricated facts.

In sum, Valdez contends that AUSA Grayson knowingly presented the fabricated, false testimony obtained by Agent Catalan's deception and manipulation of Deborah McKnight, to corroborate his knowing presentation of Alexander's allegedly false testimony.

It is undisputed that the date that B & M began operating at 1909 Jefferson Street has no relevance to the charges pending against Valdez, and, accordingly, this testimony will not be presented by the government at the upcoming trial.  Valdez asserts, however, that dismissal of the indictment pending against him under this court's supervisory powers is warranted because the circumstances surrounding the presentation of this

76

testimony at the 2009 trial shows a pattern of prosecutorial misconduct, which evidences a likelihood that this same or similar improper conduct will be repeated at his upcoming trial.

Stated differently, Valdez argues that if the government has taken the alleged improper actions with respect to the prosecution against Wyatt, it is highly probable that the government will take similar actions at his upcoming trial, requiring dismissal of the indictment pending against him under the court's supervisory powers.

The evidence presented at the hearing on the Motion was contradictory.  As set forth below, there was testimony and documentary evidence which supports Valdez' position, and there was also testimony and documentary evidence which refute that position.  Furthermore, as noted below, the testimony of the witnesses as to the events surrounding Deborah McKnight's 2009 trial testimony is contradictory.  With the exception of the testimony of AUSA Grayson, there are questions surrounding the credibility of all of the other witnesses.  Accordingly, for the reasons set forth in further detail below, based on the record before this court, the undersigned finds that the defendant, Valdez, has failed to meet his heavy burden of proof, and, therefore the Motion should be denied.

Initially, Motions to Dismiss were filed by counsel for Wyatt and Valdez. As has been set out above, the testimony complained of related solely to the alleged "guilty knowledge" of Wyatt.  This was recognized by Judge Doherty at trial.  This testimony,

regarding the date when B & M started business, has *absolutely nothing* to do with Valdez. Since Wyatt will not be a defendant in the upcoming trial, the evidence surrounding the date when B & M began business will not be heard at Valdez' trial. Accordingly, Valdez will sustain absolutely no prejudice from any of the events surrounding the testimony of Alexander and Deborah McKnight.

Counsel for Valdez attempts to avoid having to show prejudice by invoking this court's supervisory powers, in effect, arguing that AUSA Grayson, Agent Catalan and Agent Lopez engaged in subornation of perjury, part of an ongoing pattern of misconduct, which the court should punish by dismissing the indictment.

This argument completely ignores the teaching of *Hasting*, *Bank of Nova Scotia*, *Williams* and *Strouse*.  While counsel for Valdez can ignore these cases, the court cannot. Since Deborah McKnight and Jennifer McKnight will not testify at Valdez' trial, and since Alexander will not testify regarding B & M, Wyatt or Neveu, (such testimony now being irrelevant), clearly Valdez has not, and will not, suffer prejudice and the Motion to Dismiss should be denied.[19]

Because so much time was spent at the hearing on Alexander's testimony and the events leading up to the testimony of Deborah McKnight, the court feels compelled to discuss the testimony here in some depth.  The court believes that the parties are entitled

---

[19]Obviously if Wyatt was going to trial with Valdez his argument as to prejudice would be stronger.  While the undersigned expresses no opinion on the outcome of Wyatt's Motion should it still be before the court, it should be remembered that even if Wyatt would have prevailed, Valdez still would have failed to show prejudice and Valdez' Motion to Dismiss would still be denied.

to have the court address the serious allegations made by Valdez in his Motion.

Additionally, the court recognizes that this is not the final ruling on the Motion to

Dismiss; that must come from Judge Doherty.  While the undersigned believes his

analysis to be correct, it is conceivable Judge Doherty might not agree.

Finally, the court recognizes the teaching of the Supreme Court in *Hasting*, that

remedies for misconduct before the court should be "narrowly tailored."  *Hasting*, 461

U.S. at 506. One of the approved narrowly tailored remedies is detailing any misconduct

in a written opinion. *Id*  With this in mind, the court will address the conflicting evidence

surrounding the testimony of Alexander, and especially the testimony of Deborah

McKnight.

On cross-examination, Alexander testified that he went to B & M between July 26,

1999, the date he entered his guilty plea, and August 26, 1999, the date he went to jail in

Texas.  The testimony and evidence regarding this allegedly false testimony does not

establish that either Agent Catalan or AUSA Grayson knew that Alexander's testimony

was false.

While it is undisputed that the documents from the Louisiana Secretary of State

indicate that B & M was incorporated in August 2000 [D 29], as noted by Agent Catalan,

businesses can operate before being formally incorporated.  The date of incorporation,

therefore, is not determinative of the actual date that B & M began business operations.

Agent Catalan testified that he examined the documents obtained from the July 2006

search of B & M, and that he later looked up the business on the internet to verify the owners, president, directors and registered agents of the business, not to determine when the business began operating which, at that time, had no relevance to him. [*See* D 30].

Thereafter, because he believed that the seized records contained no relevant evidence, Agent Catalan returned the seized documents without providing them to AUSA Grayson. AUSA Grayson confirmed Agent Catalan's testimony on this point.  The undersigned finds that this testimony by Catalan and Grayson was credible.  Simply stated, at this early stage of the investigation, the date of incorporation of B & M was not material.  Accordingly, the credible evidence before this court does not support Valdez' charge of knowing or deliberate misconduct with respect to these records.

While the business ledger of the owner of the leased premises, Dr. Ralph Bourgeois, indicates that the prior lessee (AAMCO) paid rent through October 1999, after the date when Alexander was incarcerated, and that B & M paid a deposit followed by one-half months rent in February 2000, those records were not received by the government until 2010, after the mistrial. [D 28].  Accordingly, these records prove nothing regarding the knowledge of Catalan or Grayson on the issue prior to Alexander's trial testimony.

Dr. Bourgeois is now deceased and therefore cannot testify on this issue. Agent Lopez met with the doctor on January 29, 2009, immediately after the mistrial had been granted.  As memorialized in Lopez's email to AUSA Grayson, Dr. Bourgeois confirmed

to Agent Lopez that Wyatt and Neveu were conducting business at the 1909 Jefferson Street location prior to the time that they signed a lease in March 2000.  This is consistent with the doctor's rental ledger which showed rental payments in February 2000, and likely means that B&M started using the premises in January or February 2000. However, Agent Lopez did not prepare an ROI to further memorialize his interview with Dr. Bourgeois.

Finally, additional records received from AAMCO after the 2009 trial indicate that AAMCO ceased doing business at the Jefferson Street property in June 1999, but paid rent through October.  [G 8]. This specifically contradicts Alexander's trial testimony that he visited B & M before he began to serve his Texas sentence in 1999.

While the lease was not signed until March 2000 [G 2], Agent Catalan and AUSA Grayson both indicted that they had been told by Jennifer McKnight that Wyatt and Neveu had been operating at the 1909 Jefferson Street location on a month to month payment basis prior to the time that a lease for the premises was obtained.

In his debriefing on May 21, 2008, Alexander indicated that he had gone to the 1909 Jefferson Street location in 1999, prior to the time he went to prison in Texas. Neveu apparently disagreed with Alexander on this point in his May 28, 2008 debriefing. Apparently the ICE agents and AUSA Grayson simply believed this to be a difference in the recollection of witnesses, admittedly not an uncommon occurrence.  No investigation was done to determine whether Alexander or Neveu was correct.  Apparently, the

81

government was content to rely on Alexander's testimony.  Should the government have

attempted to determine, through further investigation, whether Alexander or Neveu was

correct?  The court believes this further investigation should have been done before

Alexander testified.  It was not.  The ICE agents and AUSA Grayson therefore did not

uncover Dr. Bourgeois' ledger before Alexander's trial testimony.

While the court believes this investigation should have been done, there is no

evidence that the failure to have conducted this investigation was done in bad faith.  It is

clear that the simple disagreement between witnesses does not support a due process

claim.  The Fifth Circuit has said that it "is not enough that the testimony is challenged by

another witness or is inconsistent with prior statements", rather, the prosecutor must know

and believe the testimony to be actually untrue before the Due Process Clause is

implicated.[20]  *United States v. Brown*, 634 F.2d 819, 827 (5th Cir. 1981).  The evidence

does not establish that was the case here.

AUSA Grayson, Agent Catalan and Agent Lopez all consistently testified that the

date that B & M began operating at 1909 Jefferson Street was not considered an issue in

the case, and did not become relevant to them until Goode, on Wyatt's behalf, moved for

---

[20]It is not clear from the record when the Neveu ROI was provided to the defendants.  It is clear
to the court that insofar as Neveu contradicted Alexander on when B & M began operations, this was
required to be disclosed to the defendants by *Brady*.  Alexander's testimony on when he first went to
B & M was important to the government's case against Wyatt to show guilty knowledge, and therefore
Neveu's conflicting testimony was clearly exculpatory.
      However, again, Valdez was not prejudiced, even if the government failed in its *Brady*
obligation, a conclusion that is not clear from the record as recalled by the court.

a mistrial based on this information.  Indeed, as best described by AUSA Grayson, whose testimony the court accepts on this point, when the issue arose at trial, he, AUSA Grayson, was "dancing" with surprise, as he had not anticipated the date that B & M began operating would be an issue, much less a controversial issue, at trial.  Likewise, because the date that B & M began doing business at 1909 Jefferson Street was not considered to be an issue, Agent Catalan credibly testified that in his initial interview with Jennifer McKnight he never asked when B & M started doing business. Apparently, the agents and AUSA Grayson simply believed Alexander, and either discounted or disbelieved Neveu.[21]

Rather, the subject of when B & M began business was not mentioned until a subsequent trial preparation meeting, wherein Jennifer McKnight reportedly said that Neveu and Wyatt were at the 1909 Jefferson Street location in 1999 paying month to month rent.  No ROI of that meeting was prepared.

---

[21]Since Neveu, in his debriefing, told the government that Wyatt was aware of the real purpose of the secret compartments, apparently the government saw no need to further investigate.  The ICE agents and AUSA Grayson apparently assumed that Alexander's statement, that he visited B & M before he reported to prison, was correct because they believed Neveu when he said Wyatt was aware of the true purpose of the secret compartments and because essentially everyone agreed that B & M began working at the Jefferson Street location before the lease was signed.

It apparently never occurred to any government representative to corroborate Alexander's anticipated testimony when the decision was made to call Alexander as a witness.  Apparently, it never occurred to any government representative that the fact that B & M began operating before the lease was signed did not necessarily mean it began operations in 1999, much less before August 1999, when Alexander reported to prison.  Frankly, given that the government was using Alexander's testimony to show guilty knowledge by Wyatt, why that investigation was not done to corroborate Alexander, who by this time was a convicted major drug supplier, is troubling to the court.

The testimony of AUSA Grayson, Agent Catalan and Agent Lopez was contradicted by the testimony of both Jennifer and Deborah McKnight.  Both testified that on every occasion that they were interviewed by the government, including when they testified before the grand jury, they were asked when B & M began doing business. Jennifer McKnight testified that she consistently answered that they incorporated in August 2000 and that they began operations a few months before then; Deborah McKnight testified that she consistently answered that she did not know.  Each witnesses was impeached, however, with her own grand jury testimony, which reflects that neither was asked the date that B & M began doing business at 1909 Jefferson Street. [G 10 and G 11].  Moreover, this information is not referenced in the ROIs of their April 2008 interviews or Agent Catalan's notes of these interviews. [D 36, D 37, D 38 and D 39].

Agent Catalan's notes of Jennifer McKnight's April 3, 2006 interview do state, "started B & M in 2000."  Agent Catalan testified that this notation refers to the date that Jennifer McKnight *began working* at B & M, as indicated in his ROI.  Catalan's notes are cryptic.  The note could refer to the date Jennifer began working at    B & M or the date B & M started operating.  The court believes Agent Catalan's testimony that his ROI accurately reflected his understanding of what Jennifer McKnight said.[22]

What actually was said at the interview will never be known.  However, the court believes that Agent Catalan believed the truth was contained in his ROI.  The court

---

[22]In fact, Jennifer McKnight did begin working at B & M in 2000.

credits Agent Catalan's testimony that when Jennifer McKnight was interviewed in 2006, the date the business started was not relevant to him, so he had no need to ask that question.  On the other hand, when Jennifer McKnight began working at B & M was relevant. Accordingly, the court does not believe that Agent Catalan was in any way duplicitous in drafting his ROI.

Based on the evidence presented, the court concludes that the information regarding the date that B & M began operations is not referenced in either the notes of Agent Catalan's interviews of the McKnights nor his ROIs of these interviews.  As the agents consistently testified, the question was simply not asked.  Furthermore, this conclusion lends additional support for the undersigned's finding that the testimony of AUSA Grayson, Agent Catalan and Agent Lopez, that the date that B & M began operating at 1909 Jefferson Street was not considered relevant to the case, and did not become relevant to them, until Wyatt moved for a mistrial at the 2009 trial based on this information, was credible.[23]

Further, although the McKnights attorney, Byron Guillory ("Guillory"), testified that he was sure the start date of B & M was a topic of discussion during meetings between the government and his clients, Guillory admitted that he could not specifically remember that the topic was brought up by the Agents or AUSA Grayson.  Rather,

---

[23]The question of why it did not become relevant to the government agents and prosecutor after Neveu refuted Alexander's statement about when B & M began operations is puzzling and remains unanswered and troubling.

Guillory explained that his answer was based on his recollection that his clients were questioned "about practically every aspect of their relationship with B & M." Guillory's testimony on this point does not therefore support Valdez' position.

Finally, the documents submitted in connection with an application by B & M for an SBA loan in 2002, which were apparently obtained during the 2006 search of B & M, neither support nor refute Valdez' claim.  The SBA loan application dated April 23, 2002, indicates that the business "started in June 2000, incorporated in Sept. 2000"; a "credit memorandum" additionally states that the business "was established in June 2000 and was incorporated in August 2000".[24] [D 34].

The government elicited testimony from Jennifer McKnight that she prepared the resumes of both Neveu and Wyatt, submitted in connection with the SBA loan, which clearly indicate that Neveu and Wyatt worked as owners of B & M from "1999–present." [G 5 and G 6].  Jennifer McKnight testified that the resumes of Wyatt and Neveu indicate that they worked as owners of B & M from "1999–present" because the loan officer at Gulf State Bank told her to falsify and misrepresent the applicants' work histories to reflect that B & M had been operating for a longer length of time so as to ensure that the bank would approve the loan.  This testimony is at least somewhat credible because it is so clearly against Jennifer McKnight's penal interest.[25]

[24]The reference to September 2000 is clearly incorrect, as the business was incorporated in August 2000.   [G 5 and G 6].

[25]See 18 U.S.C. § 1344,  Bank Fraud.

Based on the above summary of the evidence, Valdez has failed to carry his burden of proving that either Agent Catalan or AUSA Grayson knowingly presented the alleged false testimony of Alexander at the January 22, 2009 trial. The court believes that AUSA Grayson was, truly, surprised by evidence presented by Goode. Accordingly, the court concludes that AUSA Grayson did not knowingly present false testimony at trial.

Valdez next alleges that the ICE agents and AUSA Grayson knowingly fabricated and presented false testimony of Deborah McKnight at the hearing outside the presence of the jury, after the mistrial motion had been made.

The sole testimony on this issue which this court finds completely credible is that given by AUSA Grayson. AUSA Grayson testified that in a prior interview with Jennifer McKnight, he recalled Jennifer McKnight stating that Neveu and Wyatt had been operating "a shade tree kind of operation" at night in 1999, doing after market installations, while they were getting the shop ready to open on a full time basis. This was apparently at the trial preparation meeting of which no ROI was generated; this was consistent with Alexander's anticipated testimony.[26]

However, prior to the 2009 trial, the government did not think that the date that B & M began operating at the 1909 Jefferson Street location would be an issue in the

---

[26]The court believes that AUSA Grayson's recollection on this issue is probably erroneous. There is no evidence that B & M was operating in 1999, particularly not as early as the summer of 1999. That does not mean AUSA Grayson lied on this point, and the court does not believe that Grayson lied. Rather, all of the government personnel had come to the conclusion that Alexander was truthful in his statement on this point, and all government personnel simply assumed that B & M began operating in 1999. To use the current vernacular, all of the government personnel "drank the Kool-Aid."

case, much less a controversial issue at trial.  What was actually said by Jennifer McKnight at this meeting is unknown, and neither AUSA Grayson nor the ICE agents probably paid much attention to the date which, again, meant nothing to them at the time.

On January 22, 2009, when the issue arose, AUSA Grayson testified that he was "dancing" with surprise, trying to handle the situation that had arisen.  The court fully believes AUSA Grayson's testimony on this point.  AUSA Grayson sent Agent Catalan to the United States Attorney's Office to see if his legal assistant had anything on this issue to support Alexander's testimony.

The trial transcript shows that a recess was taken.  The next thing AUSA Grayson recalls is that Agent Catalan whispered in his ear that he had spoken to Deborah McKnight and that she was in the courthouse and available to testify.  Agent Catalan also told Grayson that he had spoken with Jennifer McKnight by telephone.  AUSA Grayson asked Agent Catalan to confirm the information he, Catalan, received from Deborah McKnight because he was not going to call Deborah McKnight to testify, or tell the court what she would testify about, unless the information was confirmed.

Agent Catalan next told AUSA Grayson that the information had been confirmed. AUSA Grayson thought that Agent Catalan had confirmed this information personally, but he could not specifically remember because Agent Lopez was also present. Accordingly, AUSA Grayson advised the court that Deborah McKnight and Jennifer McKnight could testify on this issue, corroborating Alexander's testimony, and that

Deborah McKnight was immediately available to testify.  AUSA Grayson frankly testified at the hearing on this motion that if Agent Catalan had not told him that Deborah McKnight said that B & M had opened in 1999 he would not have called her to the stand.

As confirmed by Deborah McKnight, AUSA Grayson never spoke with Deborah McKnight on January 22, 2009 before he called her to testify.  Indeed, AUSA Grayson testified that he did not know why Deborah McKnight was in the courthouse; he thought both she and Jennifer McKnight were on standby.

AUSA Grayson's testimony at the hearing is consistent with the 2009 trial transcript.  There is no evidence in the record which causes this court to doubt AUSA Grayson's testimony. Finally, having had the opportunity to view AUSA Grayson's demeanor on the stand, and listen to his testimony, the court concludes that AUSA Grayson's testimony on this issue was entirely truthful and his version of events was completely credible.

AUSA Grayson's testimony is further supported by the actions he took after the case was mis-tried in 2009.  In preparation for the upcoming re-trial, AUSA Grayson met with both Deborah and Jennifer McKnight.  Thereafter, on August 2, 2010, AUSA Grayson wrote a letter to the Court and counsel captioned "Notice of Inconsistent Statements."  In that letter, AUSA Grayson wrote that he had learned, for the first time, that the McKnights' prior statements had changed.  In the letter, AUSA Grayson advised that during his recent interview, Jennifer McKnight who "had told agents that B & M was

89

being operated by Barry Neveu and Michael Wyatt at 1909 Jefferson Street earlier than

2000, i.e. 1999 . . . recently asserted that B & M began operating on the Jefferson Street

property in 2000 some time before B & M's incorporation in 2000 and denies ever having

told the government anything different."  [D-51].

Moreover, the letter advises that during the interview "Deborah McKnight

recanted her earlier interviews and her testimony given during the January 2009 trial –

that Barry Neveu and Michael Wyatt were operating a business on Jefferson Street in

1999." [D-51].  Thus, immediately upon learning this information, AUSA Grayson did

exactly what he was required to do, he notified counsel and the court.

While AUSA Grayson's testimony is complete and credible, the same cannot be

said about all of the other witnesses.  The following represents a summary of the

contradictory testimony on Deborah McKnight's testimony to the court, out of the

presence of the jury, after Alexander testified.

Agent Catalan testified that after the issue had arisen, AUSA Grayson asked Agent

Catalan to go the United States Attorney's Office to speak with his legal assistant to see if

there was any evidence to show that B & M was operating at 1909 Jefferson Street in

1999.  Accordingly, Agent Catalan left the courtroom, located on the fourth floor, to go to

the United States Attorney's Office, located on the second floor.  Outside the United

States Attorney's Office, Agent Catalan saw Deborah McKnight.  Agent Catalan asked

Deborah McKnight if she knew when B & M began operating at 1909 Jefferson Street;

was it in 1999 or 2000?  Deborah McKnight responded, 1999.  When Catalan asked her why she remembered, Deborah McKnight replied that she knew it was 1999 because she had brought her vehicle there for Neveu to work on.  When Agent Catalan asked if Deborah McKnight was sure about that, Deborah indicated that Jennifer McKnight would know better than did she.

Agent Catalan and Deborah McKnight went into the conference room of the United States Attorney's Office and called Jennifer McKnight to verify what Deborah McKnight had just stated.  According to Agent Catalan, Jennifer McKnight advised him, on the telephone, that the year was 1999, and said that they (Neveu and Wyatt) were renting month to month prior to signing a lease.  Agent Catalan told Jennifer McKnight that he needed her to come to court to testify.  Jennifer advised that she was not going to go to court because she did not want to lose her job.  She, Jennifer McKnight, then told Agent Catalan to use whatever date the lease said.

Agent Catalan then testified that he told Deborah McKnight that Jennifer McKnight first said 1999, but that she was not going to testify, so he, Agent Catalan, needed her, Deborah McKnight, to testify to what she had told him in the hallway.  Agent Catalan did not tell Deborah McKnight that Jennifer had told him to use the date of the lease.  Agent Catalan testified that at no time did Deborah McKnight ever tell him that she did not know the date that B & M began operating at 1909 Jefferson Street.

Agent Catalan returned to the courtroom and told AUSA Grayson what Deborah and Jennifer McKnight had told him.  AUSA Grayson then asked Agent Catalan to confirm Deborah McKnight's testimony.  Agent Lopez then went out to the witness room, where Deborah McKnight was then located, to speak with her.  Agent Catalan did not go with Lopez.  Thereafter, Agent Lopez returned to the courtroom and reported to Agent Catalan and AUSA Grayson that Deborah McKnight said that Neveu and Wyatt opened in 1999 prior to the lease being signed.

Agent Lopez testified that when the issue was raised, he was verbally told by either Agent Catalan or AUSA Grayson to go to the witness room and ask Deborah McKnight to confirm that the business operated at 1909 Jefferson Street prior to 2000.  Agent Lopez then exited the courtroom and spoke with Deborah McKnight.  Initially, Agent Lopez testified that Deborah McKnight confirmed that the business was operating in 1999. Agent Lopez then went back to the courtroom and advised either Agent Catalan or AUSA Grayson that Neveu and Wyatt were "in there prior to 2000, that they were in there in 1999."

However, after being shown a sworn statement which Lopez gave to the Office of the Inspector General, Agent Lopez testified that he asked Deborah McKnight if they (Neveu and Wyatt) were in the building prior to the lease being signed, and that Deborah

McKnight stated that they were.[27]  Agent Lopez did not, however, ask Deborah McKnight about *the date* that Neveu and Wyatt began operating at the location, but merely confirmed that they were operating at the premises prior to the lease being signed. When confronted with the inconsistency, Lopez said that he did not specifically inquire about the date, only that B & M began operating before the date of the lease.  Agent Lopez testified that he had no contact with Jennifer McKnight on January 22, 2009.

Deborah McKnight testified that on January 22, 2009 she was under subpoena and that she had been instructed by someone, whose identity she could not remember, to be at the courthouse.  When she arrived, she was told by someone, again she could not remember who, where to go.  While she was sitting in the witness room outside the courtroom, Agent Lopez approached her and asked whether B & M was opened in 1999 or 2000.  She told Agent Lopez that she did not know.  Agent Lopez went back into the courtroom.

Then, Agent Catalan came out of the courtroom and motioned for her to come out of the witness room into the hall.  While in the hall, Agent Catalan asked Deborah McKnight when B & M opened.  On direct examination at the hearing of the instant Motion, Deborah McKnight's response was, again, that she did not know.  Deborah McKnight said she told Agent Catalan that her daughter, Jennifer, would know.  At that

---

[27]The significance, of course, is that the lease was signed in March 2000, and even if B & M began operating before that date, that did not necessarily mean they began operations in 1999, much less in the summer of 1999 as Alexander had testified.

point, Deborah McKnight testified that Agent Catalan took her to a conference room in

the United States Attorney's Office.  Agent Catalan then called Jennifer McKnight.

According to Deborah McKnight, this was the sole call Agent Catalan made to Jennifer

that day.  At the conclusion of the conversation, Agent Catalan told Deborah McKnight,

"you're correct, it's 1999."

Deborah McKnight and Agent Catalan then went back to the fourth floor and

Agent Catalan took her immediately into the courtroom, where she was called to testify.

Deborah McKnight did not talk to AUSA Grayson before her testimony.

When she left the courthouse after her testimony, Deborah McKnight testified that

she called her daughter, Jennifer McKnight, to ask what Jennifer had told Agent Catalan.

Jennifer told Deborah that she told Catalan that the business started in 2000. That

response upset Deborah McKnight. Later that evening, Deborah McKnight testified that

she got in touch with her attorney, Guillory.

Jennifer McKnight testified that on January 22, 2009, she received about three

telephone calls from both Agent Catalan and Agent Lopez, asking when B & M opened.

She responded that the business incorporated in August of 2000, but that they (Neveu and

Wyatt) had acquired the building a few months prior to that.  Later that afternoon she

spoke with her mother, Deborah McKnight, and told her, Deborah, that she told the

agents that B & M incorporated in 2000 and that B & M was in the building a few months

prior to that.  Deborah became very upset.  That same afternoon, Jennifer McKnight

contacted her attorney, Guillory.

Apparently, although both Jennifer and Deborah McKnight claim to have been

upset as a result of the events of January 22, 2009, nothing was immediately done by

either Deborah or Jennifer McKnight or their attorney, Guillory, with respect to this issue.

The undersigned is unable to credit the entire testimony given by any of the above

witnesses with respect to the events which occurred on January 22, 2009.  Agent

Catalan's testimony that he encountered Deborah McKnight on the second floor of the

courthouse, instead of the witness room on the fourth floor outside the courtroom, seems

unlikely, but is immaterial.  Agent Catalan's explanation that Jennifer McKnight said that

B & M started in 1999, and then, after repeatedly cooperating with the government,

refused to testify, instead suggesting that the government merely rely on the date of the

lease, seems likewise implausible, particularly since she was under subpoena.

Furthermore, Agent Catalan claims to have told AUSA Grayson what he had

learned from both witnesses, but, apparently, neglected to tell AUSA Grayson that

Jennifer refused to testify. The court seriously doubts that AUSA Grayson, whose

testimony the undersigned fully accepts, would have indicated to the court that Jennifer

McKnight could confirm the 1999 opening date if he had been told by Catalan that

Jennifer had refused to testify.

Agent Lopez' testimony is internally contradictory.  He was unable to credibly explain what he had been asked to verify when he exited the courtroom; he was unable to credibly testify about his conversation in the witness room with Deborah McKnight.

Jennifer McKnight's testimony is also suspect.  Nothing, including the testimony of her mother, supports Jennifer McKnight's testimony that she received about three telephone calls at work on January 22, 2009.  Moreover, given that she had not been in the courtroom when the relevance of the date of incorporation and lease became an issue, her testimony tying the date operations began to both of these documents is suspect.

Finally, the testimony of Deborah McKnight, the witness whose testimony is most crucial to Valdez' position, is unreliable.  Deborah McKnight's current testimony flatly contradicts her testimony, also under oath, given on January 22, 2009.  While Deborah McKnight now claims that she testified that B & M was operating in 1999 only because Agent Catalan had mislead her into believing that Jennifer McKnight had said to him that was the correct date, McKnight's testimony before the court went well beyond simply confirming the 1999 date, and included facts that Agent Catalan is not alleged to have planted in her mind, that is, that she remembered having work done on her car at B & M in 1999.

At the 2009 hearing outside the presence of the jury, on direct examination, AUSA Grayson asked Deborah McKnight only a few questions to elicit the information that Agent Catalan had told AUSA Grayson that Deborah McKnight would confirm.  In

response to AUSA Grayson's questions, McKnight responded that Neveu and Wyatt officially started B & M in 2000, and that prior to that, in 1999, they had been preparing the business.

Rather than simply parroting what Agent Catalan allegedly told her that Jennifer McKnight had said to him, on cross-examination by William Goode, Wyatt's attorney, Deborah McKnight testified,  "I went there before 2000".  She explained that her son-in-law (Neveu) actually installed "some stuff" in her car at that location in 1999.

Furthermore, when asked on cross-examination at the hearing on the instant Motion why Agent Catalan would say "you're correct, it's 1999" if she, Deborah McKnight, had previously told Agent Catalan that she had no idea when the business began operating, Deborah McKnight did not deny that Catalan told her that her prior statement in the hall to him was "correct."  Instead, Deborah McKnight testified that she probably said "it could have been 1999, it could have been 2000. I don't know."  That explanation is in stark contrast to her testimony on direct examination at the hearing on this Motion, when Deborah McKnight repeatedly testified that she told Agent Lopez and Agent Catalan that she did not know when B & M started business.

Deborah McKnight's  testimony that she was approached by Agent Lopez first, and then Agent Catalan, is wholly unsupported, given the testimony of AUSA Grayson, and the testimony and actions of Agent Lopez to the effect that he only talked to Deborah McKnight to confirm her statements to Agent Catalan.

For these reasons, the undersigned cannot accept Deborah McKnight's current version of events, nor can the undersigned accept the testimony of Jennifer McKnight. Moreover, the undersigned cannot fully credit the testimony of Agent Catalan or Agent Lopez, except where that testimony is consistent with that given by AUSA Grayson.

The conflict in testimony between that given by Agent Catalan and Agent Lopez and that given by the McKnights can be explained by the passage of time and each witnesses' interpretation of the conversations in which they were participants based on their individual perspectives at the time, the information which they now possess, and the animus on both sides.  It is also possible that some, or all, of them are lying.  The court simply cannot tell.

Further, while it is clear that Agent Catalan wanted Deborah McKnight to "remember" that B & M started business in 1999, the evidence does not support a finding of fact that Agent Catalan deceived or manipulated Deborah McKnight into testifying as she did at the January 2009 trial.  We will never know what specifically was said during that telephone call between Agent Catalan and Jennifer McKnight.

The court would be remiss, however, if it failed to specifically comment on one point.  In one important regard Agent Catalan can be seriously faulted.  According to his testimony at the hearing, after he finished his telephone call with Jennifer McKnight, he turned to her mother, Deborah, and told Deborah (paraphrasing here) that "at first"

Jennifer said 1999, but she is refusing to testify, so you will need to testify to what you told me in the hallway.

It is clearly improper for a government agent to tell one trial witness what another trial witness has told him.  It is particularly improper to do what Agent Catalan did here, that is, to reinforce the recollection of an unsure witness, as Deborah McKnight was, by telling the unsure witness that her memory has been confirmed by another witness.

The harm created is evident here.  Clearly, Deborah McKnight was unsure of when B & M began operating.  That is clear from her statement to Agent Catalan that they should call her daughter Jennifer.  However, after hearing from Agent Catalan that Jennifer had confirmed the date, Deborah was a much more sure and confident witness who was combative with attorney Goode during his cross-examination.

Again, there is absolutely no indication in the record that AUSA Grayson knew what had happened in the United States Attorney's Office, much less sanctioned or directed what occurred.

In sum, the testimony on this issue is inconclusive and, accordingly, neither establishes, nor refutes, Valdez' claim that Agent Catalan manufactured false testimony by knowingly deceiving and manipulating Deborah McKnight.  Valdez has therefore failed to carry his burden on the Motion.

What is absolutely clear is that AUSA Grayson did not knowingly present fabricated testimony of Deborah McKnight to corroborate Alexander's allegedly false

testimony.  It is absolutely clear that AUSA Grayson did not know any of the allegedly improper circumstances surrounding the procurement of Deborah McKnight's testimony. AUSA Grayson merely relied on the information Agent Catalan and Agent Lopez provided to him, namely, that Deborah McKnight would confirm that B & M was operating at 1909 Jefferson Street in 1999.

Under these circumstances, dismissal of the indictment is not warranted.  Valdez has not established that there has been a pattern of prosecutorial misconduct that warrants the imposition of this extreme remedy, nor that any alleged pattern will be repeated at the re-trial of this case.

Furthermore, even if the undersigned were to fully accept the testimony of the McKnights, and fully reject the testimony of Agent Catalan and Agent Lopez, the second superceding indictment against Valdez cannot be dismissed under this court's supervisory powers.

As noted above, under *Strouse*, the governmental misconduct necessary for the exercise of this court's supervisory powers of dismissal is limited solely to the conduct of prosecutors. *Strouse*, 286 F.3d at 774-776.  Stated differently, *Strouse* makes clear, that under the teachings of *Mechanik*, *Bank of Nova Scotia* and *Williams*, dismissal of an indictment under the court's supervisory power may only be based on a finding of misconduct by the prosecutor, and a showing of prejudice.  Perjury by a government agent is insufficient.

100

It is absolutely clear that AUSA Grayson did not know that Deborah McKnight may have been mislead, deceived or coerced into testifying as she did on January 22, 2009.  It is further absolutely clear that AUSA Grayson did not know that Deborah McKnight was testifying falsely, or testifying to facts of which she was unsure.  Absent such evidence this court has no basis on which to dismiss the original or first superceding indictment returned against Valdez, much less the second superceding indictment. *Strouse, supra*.

Pattern or not, Valdez has failed to demonstrate that he has sustained any prejudice as a result of the alleged false and fabricated testimony.  In this case, even if Agent Catalan did improperly influence or intimidate Deborah McKnight to testify falsely about the date that B & M went into business, that alleged misconduct clearly did not prejudice Valdez.  While such actions would be clearly improper, the alleged misconduct had no affect whatsoever on Valdez.  Valdez has never been alleged to have had any connection to Wyatt, Neveu or B & M.  Rather, he has consistently been named in all three indictments returned in this case in connection with overt acts dealing *solely* with his having been in possession of drugs, and assisting in the importation or transportation of drugs. Indeed, at the upcoming trial, testimony regarding B & M, including testimony as to when B & M went into business and the date that Alexander first allegedly went to B & M will certainly not be presented by the government, as such testimony has no relevance to the charges currently pending against Valdez.

101

Accordingly, pre-conviction dismissal of the second superceding indictment is not warranted.

For these reasons, Valdez' claims warrant no relief.

## III.  Structural Error

Moreover, the errors alleged herein do not fall within the "very limited class of cases" which could be deemed structural errors, sufficient to exempt Valdez from demonstrating prejudice.  Unlike the defects which the Supreme Court has found to be structural, the errors alleged herein do not necessarily render Valdez' criminal trial fundamentally unfair or an unreliable vehicle for determining Valdez' guilt or innocence.

To the contrary, Valdez has been indicted by an impartial, racially and sexually diverse, non-discriminatory grand jury, based on untainted evidence presented by an impartial and unbiased prosecutor.  He will be tried before an impartial judge, under the correct standard of proof and with the assistance of competent and able counsel.  The government will not present any evidence about the date that B & M began doing business.  Moreover, a fairly selected, impartial jury will be instructed to consider all of the evidence presented at trial with respect to Valdez' guilt or innocence.  Accordingly, the errors alleged herein simply do not rise to the level of the type of error which "transcends the criminal process."  *See Arizona v. Fulminante*, 499 U.S. 279, 311, 111 S.Ct. 1246 (1991).

102

Valdez cites *Berger v. United States*, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935) as supporting his position that the facts of this case warrant dismissal of the indictment.  However, *Berger* is distinguishable.  The *Berger* Court assessed the impact of repeated instances of misconduct by the prosecuting attorney *during trial* which had a "probable cumulative effect upon the [petit] jury" and which the Court found could not be "disregarded as inconsequential", thus making it "highly probable" that the accused was prejudiced.  Accordingly, the Court granted the defendant a new trial. *Berger*, 295 U.S. at 89.

Notably, the *Berger* Court did not find the conduct of the prosecutor mandated complete dismissal of the indictment, much less dismissal in the absence of a showing of prejudice.  To the contrary, the remedy was remand for a new trial untainted by the prejudicial actions of the prosecutor. That is exactly what will occur in this case.  *Berger* therefore is inapposite.

**IV.  Outrageous Conduct**

The United States Supreme Court has indicated, *in dicta*, that there may be circumstances in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial process to obtain a conviction. *United States v. Russell*, 411 U.S. 423, 430, 93 S.Ct. 1630, 1642-43,

36 L.Ed.2d 366 (1973) and *Hampton v. United States*, 425 U.S. 484, 487, 96 S.Ct. 1646, 1649, 48 L.Ed.2d 113 (1976). This *dicta* has been recognized by the Fifth Circuit, although it has apparently never been applied in this circuit.[28]   *See United States v. Nissen*, 928 F.2d 690, 693 (5th Cir. 1991) ("[t]he due process clause also places other limits on the improper conduct by law enforcement agents, even as against culpable persons . . . [h]owever, a due process violation will be found only in the rarest and most outrageous circumstances.") (internal citation omitted); *United States v. Posada-Carriles*, 541 F.3d 344, 353 (5th Cir. 2008) (same); and *United States v. Collins*, 972 F.2d 1385, 1396 (5th Cir. 1992) (same).

Thus, absent prejudice, Valdez must rely on the dicta in *Russell-Hampton*, as recognized in *Nissen*.  Under this very high standard, the misconduct by government

---

[28]In *Collins, infra*, the court noted that there appeared to be only one circuit court case in which a conviction was invalidated on *Russell-Hampton* grounds, *United States v. Twigg*, 588 F.2d 373 (3d Cir. 1978). In that case, the government devised and ran the criminal enterprise with only meager assistance from the defendants. There is considerable doubt, however, regarding whether *Twigg* remains good law in the Third Circuit. *See United States v. Beverly*, 723 F.2d 11, 12 (3d Cir. 1983); *United States v. Jannotti*, 673 F.2d 578, 610 n. 17 (3d Cir.) (*en banc*), *cert. denied* 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982).  The undersigned has been unable to locate any other circuit case which has dismissed an indictment on these grounds.

Furthermore, the current trend in the courts of appeals seems to question the continuing validity of the doctrine itself. Most notable is the emphatic opinion of the Court of Appeals for the Sixth Circuit in *United States v. Tucker*, 28 F.3d 1420 (6th Cir. 1994), *cert. denied*, 514 U.S. 1049, 115 S.Ct. 1426, 131 L.Ed.2d 308 (1995), which squarely rejected the doctrine. That panel also expressed concern that courts' scrutiny of government agents' conduct during federal investigations presented a dangerous threat to the separation of powers. *Tucker*, 28 F.3d at 1426.  *See also United States v. Nava–Salazar*, 30 F.3d 788, 800 (7th Cir.), *cert. denied sub nom. Casas v. United States*, 513 U.S. 1002, 115 S.Ct. 515, 130 L.Ed.2d 421 (1994) (questioning the continuing validity of the doctrine); *United States v. Miller*, 891 F.2d 1265, 1271 (7th Cir. 1989) (Easterbrook, J., concurring) (advocating the complete rejection of the doctrine).

agents must constitute one of those "rarest" of cases with the "most outrageous" circumstances. *Nissen, supra*.

The circumstances presented here are not so outrageous that due process principles would absolutely bar the government from invoking judicial process to obtain a conviction. While there is a great deal to criticize in the investigation and presentation of the evidence in this case, the undersigned cannot conclude that Valdez has satisfied the very high standard necessary for application of the *dicta* in *Russell-Hampton*, as recognized in *Nissen*.

Frankly, the court believes that the investigation of the case that went to trial was, to some extent, careless, haphazard and far from thorough. That is concerning to the court. However, the court's concern does not rise to the level of undermining the fundamental fairness of the criminal proceeding against Valdez, nor are the circumstances "shocking to the universal sense of justice." *See Russell*, 411 U.S. at 423. In sum, Valdez has not shown that the misconduct alleged herein, even if proven, constitutes one of those "rarest" of cases with the "most outrageous" circumstances, justifying dismissal of the pending indictment. *Nissen, supra*.

## V. Request to Exclude Alexander from Testifying at Trial

Alternatively, Valdez argues that, under the supervisory powers of this court, Alexander should be precluded from testifying at trial. This request is based on Valdez'

105

belief that Alexander "is a known liar . . .  based on his numerous lies and history before the court."  Valdez cites the Stipulated Factual Basis for Sharon Vallier's guilty plea for perjury, wherein Vallier "apologized for not being truthful" in an earlier interview, and stated that "she was scared of going to jail and that Eric Alexander had told her that it would be best for her if she did not admit to anything. . . ." [Ex. D 14].

Valdez additionally cites Alexander's plea, wherein Alexander allegedly agreed to "numerous hearsay statements that he had no personal knowledge and cannot testify to", and Alexander's alleged perjury at the January 2009 trial, discussed above, that he, Alexander, went to B & M in 1999.

Alexander has not yet testified against Valdez with respect to the second superceding indictment.  It is clear, however,  that Valdez seeks to punish the government for the alleged past perjury of Alexander.  It is equally clear that the alleged perjured testimony will not be presented by the prosecution at the re-trial of this case, as the date that B & M came into existence has no relevance whatsoever to the criminal charge pending against Valdez.  Moreover, in the event that the prosecution attempts to elicit such testimony, the court is confident that proper objection will be raised.

Likewise, the undersigned cannot envision any relevant testimony which Sharon Vallier could offer with respect to Valdez.  If such testimony was available, any objectionable testimony may be challenged at trial by cross-examination or objection. Moreover, contrary to Valdez' position, the Stipulated Factual Basis for Vallier's plea

does not demonstrate that Alexander told her to commit perjury.  Rather, Alexander simply advised her "not to admit to anything."  Thus, Valdez' reliance on Vallier's plea to justify prohibiting Alexander from testifying at trial appears unfounded, though it may prove useful in cross-examination.

While the supervisory powers of this court permit consideration of sanctions less extreme than that of dismissal in order to maintain the integrity of this court, those lesser sanctions should not "cut off the public interest in having indictments prosecuted." *See Welborn* 849 F.2d at 985.  Under the facts of this case, precluding Alexander from testifying about facts material to Valdez' prosecution, as punishment for alleged perjury regarding facts which are not material to the charges against Valdez, would have this exact effect. This court cannot recommend such a result.

For the above reasons, **IT IS RECOMMENDED** that  Antonio Luna Valdez Jr.'s Motion to Dismiss [rec. doc. 919] be **DENIED.**

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed.R.Civ.Proc. 72(b), parties aggrieved by this recommendation have fourteen (14) days from service of this report and recommendation to file specific, written objections with the clerk of court.  A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.

**Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this Report and Recommendation within**

107

fourteen (14) days following the date of its service, or within the time frame authorized by Fed.R.Civ.P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Court, except upon grounds of plain error.  *See Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir.  1996).

THUS DONE AND SIGNED in Lafayette, Louisiana, December 30, 2011.

C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE